**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Dudley Lee BERRY, a/k/a David Sarver,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jessica Linda Ann ZABISH, a/k/a**
**Joanne Sarver,**
**Defendant-Appellant.**

**Nos. 79–5471, 79–5472.**

United States Court of Appeals, Fifth Circuit.*
Unit B

March 19, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Bruce E. Pashley, Merren & Pashley, Atlanta, Ga., for defendant-appellant.

Jake Arbes, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Robert Altman, Atlanta, Ga., for amicus.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., HATCHETT, ANDERSON, and THOMAS A. CLARK, Circuit Judges.**

FRANK M. JOHNSON, Jr., Circuit Judge:

Recently we repeatedly have had to decide cases involving the legality of stops, interrogations, and searches of suspected drug smugglers by law enforcement officers at airports. The matters presented in these cases raise fundamental constitutional issues concerning the Fourth Amendment safeguards protecting individuals against unreasonable searches and seizures. Because of the uncertainty created by deci-

sions of the Supreme Court and by our own holdings concerning the standards guiding such stops, we take this opportunity to consider en banc the appeals of Dudley Berry and Jessica Zabish. Appellants' primary issues on appeal concern their convictions below [1] on charges stemming from the discovery of cocaine during an airport stop and search by Drug Enforcement Agency (DEA) agents.

I.

■ DEA agent Paul Markonni and detective C. B. Denton observed appellants as they were deplaning from a flight from Miami, Florida, to Atlanta, Georgia.[2] As appellants entered the terminal, Markonni, without knowing why, was vaguely aware of having seen a photograph of Berry. Berry stared intently at the agents when leaving the airport gate and again in the baggage-claim area while walking back and forth several times in front of the agents. He, along with Zabish, also repeatedly looked nervously toward the agents while walking down the concourse toward the baggage-claim area and while waiting in the area.

Markonni first approached Berry outside the terminal as Berry was taking appellants' luggage toward a taxi stand to which Zabish had gone to wait. After the agent had identified himself, asked to talk to Berry, and inquired about Berry's identity and travel plans, Berry gave his name as David Sarver and stated that he was travelling alone. He nevertheless produced two tickets with the names of David and Joanne Sarver. When asked for further identification he showed Markonni a driver's license with the name Dudley Berry. Markonni recognized the name as that of a man for whom he had been told to watch. After Berry admitted that Zabish actually was travelling with him, Markonni motioned to

---

** Judge Henderson did not participate in the consideration or decision of this case.

1. Appellants were convicted at separate trials. Their cases were consolidated on appeal.

2. We note that on appeal we review the facts in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Troutman*, 590 F.2d 604, 606 (5th Cir. 1979) (per curiam).

her to join them; at the same time Denton walked over to Zabish, may have touched her elbow, pointed toward Markonni and Berry, and asked her to join them. Markonni identified himself to Zabish and asked for her name. She stated that her name was Joanne Sarver. When informed that Berry had admitted his true identity and asked whether she wanted to change her answer, Zabish made no reply but did appear extremely nervous. Markonni asked whether appellants were carrying drugs. Berry said they were not. Markonni then asked appellants to accompany him to a DEA office. Berry agreed. En route, when Berry asked whether appellants had violated any law, Markonni responded that appellants had violated a Georgia law by falsely identifying themselves to police officers.[3] He noted, however, that "there would be no problem" if a search revealed no drugs.

Inside the DEA office, Markonni asked for appellants' consent to a search, informing them that they could refuse consent and that they could contact an attorney.[4] Appellants acknowledged understanding their rights. They discussed between themselves whether to consent. When Zabish indicated that perhaps they should talk to an attorney, Markonni invited them to do so. Berry told Zabish that the decision was up to her and Zabish then agreed to a search, with Berry affirming the consent. Markonni discovered cocaine hidden in a film shield inside a shaving bag in Berry's luggage. During a search by a female officer, Zabish tried to swallow a container of cocaine. Appellants were arrested.

The magistrate below found that the initial stop of appellants was not a seizure. A seizure did occur, according to the magistrate, when Markonni asked appellants to accompany him to the DEA office. The magistrate concluded that appellants had been arrested approximately when they arrived at the office after Markonni had informed them that they had violated Georgia law and after he had tipped the skycap depositing appellants' luggage in the office with the comment that the next tip was on appellants "if and when" they took the luggage out. Without delving into the legality of an arrest, the magistrate found that appellants freely and voluntarily had consented to a search.

The district court, rejecting the magistrate's findings, held that, as a matter of law, a seizure had occurred when the agents initially stopped appellants at the airport. The court, nevertheless, held that appellants' voluntary consent to a search had attenuated the taint of any illegal seizure and overruled a motion to suppress the evidence resulting from the search. Tried separately, both appellants were found guilty of possessing cocaine hydrochloride with intent to distribute, in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2. Zabish also was convicted of simple possession of cocaine hydrochloride, in violation of 21 U.S.C.A. § 844.[5]

## II.

Among our most cherished constitutional rights is the Fourth Amendment's guarantee that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches, shall not be violated . . . ." The fundamental nature of this guarantee has long been noted:

3. Appellants had violated Georgia Code Section 26–2506, which provides:
 A person who gives a false name or address to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identification is guilty of a misdemeanor.

4. Appellants contested Markonni's assertion that Markonni told appellants they could refuse consent to a search. We are bound by the district court's adoption of the magistrate's credibility finding that the testimony of the drug agents was accurate. *See United States v. Bowles*, 625 F.2d 526, 536–37 (5th Cir. 1980).

5. The panel opinion on the appeals of Berry and Zabish, vacated by our decision to rehear the case en banc, may be found at 636 F.2d 1075 (5th Cir. 1981).

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). Recognizing our duty zealously to protect individuals from abridgements of their rights to liberty and privacy, we approach Berry's and Zabish's contentions on appeal that the cocaine seized at the Atlanta airport should have been excluded because the stop and seizure by police violated their Fourth Amendment rights. We examine initially the law governing non-border stops at airports: whether or at what point a stop invokes Fourth Amendment safeguards and what factors might provide reasonable suspicion for a stop. We then proceed to apply that law to the facts of this case.

### A.

Appellants claim that any interrogation police initiate at an airport must be held a seizure that we cannot sanction unless it is based on reasonable suspicion. Our examination of their contention must begin with the seminal ruling establishing the analytical approach for police stops, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An experienced police officer in that case approached men he suspected of preparing to rob a store, identified himself, and asked them for their names. On receiving only a mumbled response, the officer grabbed one of the men, spun him about, patted down his clothing, and found a gun in the man's coat. That stop, though brief and short of a full-scale arrest, was, the Court held, within the Fourth Amendment's ambit. The Court nevertheless declined to subject such a stop to the rigors of a justification based on probable cause. Rather, balancing the government interest

involved against the nature of the intrusion on the individual, it found a showing of "reasonable suspicion" sufficient.[6]

In *Terry* itself the Court declined to decide whether the rationale of the decision would apply also to stops merely for investigatory purposes. 392 U.S. at 19 n.16, 88 S.Ct. at 1878 n.16. Subsequent cases have, however, so extended the doctrine. In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court upheld a seizure of an individual on the basis of a reasonable suspicion derived from an informant's tip, noting that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo temporarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 146, 92 S.Ct. at 1923. Similarly, in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court upheld an investigatory seizure, stating that "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *Id.* at 881, 95 S.Ct. at 2580.

Although the Supreme Court has extended the doctrine it articulated in *Terry* to investigative seizures, it has not necessarily concluded that all contact between citizens and police in the course of an investigation is subject to the Fourth Amendment's rigors. The Court has repeatedly stated that the Fourth Amendment neither does, nor should, inhibit voluntary interaction between police and citizens. "[I]t is no part of the policy underlying the Fourth ... Amendment[ ] to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971). In *Terry* the Court carefully noted that, "[o]bviously,

---

**6.** The probable cause requirement is derived from the Fourth Amendment's statement that "no warrants shall issue, but upon probable cause". The *Terry* Court ruled that clause inapplicable because the facts at issue "deal[t]

... with an entire rubric of police conduct ... which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." 392 U.S. at 20, 88 S.Ct. at 1879.

not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. at 19 n.16, 88 S.Ct. at 1878 n.16. *See also id.* at 34, 88 S.Ct. at 1886 (White, J., concurring); *id.* at 31, 32–33, 88 S.Ct. at 1885 (Harlan, J., concurring); *Reid v. Georgia,* 448 U.S. 438, 440 n.\*, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam); *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968). In the particular context of police questioning of citizens, the Supreme Court has indicated that the Fourth Amendment does not transform all such communication into an adversarial encounter. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973); *Davis v. Mississippi,* 394 U.S. 721, 727 n.6, 89 S.Ct. 1394, 1397 n.7, 22 L.Ed.2d 676 (1969); cf. *Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). To hold otherwise would be unfortunate, given the common interest of police and citizens in safety and in effective law enforcement. Essential to that interest is the ability of police to question individuals, for "[w]ithout such investigation those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved." *Schneckloth, supra,* 412 U.S. at 225, 93 S.Ct. at 2046. The Supreme Court has, indeed, specifically noted that "[i]t is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." *Miranda, supra,* 384 U.S. at 477–78, 86 S.Ct. at 1629.

■ We conclude, therefore, that Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief "seizures" that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause. *See, e.g., United States v. Setzer,* 654 F.2d 354 (5th Cir. 1981); *Elmore v. United States,* 595 F.2d 1036, 1041 (5th Cir. 1979), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). This theoretical framework, however, we must apply in the context of an airport stop to determine in which tier the stop, and developments subsequent to a stop, should fall. We consider initially whether any airport stop must be held a seizure.

### B.

In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court specifically considered whether seizures occurred in the context of airport stops. 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In that case, two DEA agents stopped Sylvia Mendenhall, whose behavior fit aspects of a drug courier profile composed by DEA agents, as she was disembarking from a plane. The agents identified ·themselves, then asked Mendenhall for identification and for her plane ticket. Mendenhall explained that the two documents bore different names because "she just felt like using two names." An agent returned the documents, then asked Mendenhall to accompany him to a DEA office for further questioning. In the office the agent asked·her to consent to a search and informed her of her right to refuse consent. Mendenhall, after complaining that she had a plane to catch and being assured that there would be no problem if she were carrying no narcotics, began to disrobe. The search revealed drugs.

The *Mendenhall* Court was unable to produce a majority opinion. Justice Stewart, joined by Justice Rehnquist, relied on *Terry, supra,* and *Sibron, supra,* in concluding that reasonable suspicion need not underlie every stop and interrogation. Rather, they would hold, unless "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave", the Fourth Amendment was inapplicable. 446 U.S. at 554, 100 S.Ct. at 1870. Moreover, because Mendenhall's decisions to accompany the agent to

the office and to consent to a search were voluntary, they too neither constituted a seizure nor triggered Fourth Amendment safeguards.

The concurring opinion by Justice Powell, joined by the Chief Justice and Justice Blackmun, declined to decide whether the initial stop constituted a seizure. Noting that, though he did "not necessarily disagree" with Justice Stewart's views, "[f]or me, the question whether the respondent reasonably could have thought she was free to 'walk away' when asked by two Government agents for her driver's license and ticket is extremely close," 446 U.S. at 560 n.1, 100 S.Ct. at 560 n.1, Justice Powell concluded that, even if a seizure did occur, it was justified by reasonable suspicion. Balancing the public interest served by the seizure, the nature and scope of the intrusion, and the facts on which the officer relied, Justice Powell found the interest in interdicting drug traffic great, the intrusion minimal, and the objective facts sufficient.[7]

The fractured legal conclusions of the majority in *Mendenhall* leave us without guidance in deciding whether an initial airport stop such as that in this case constitutes a seizure. Appellants, however, aver that other Supreme Court cases compel a conclusion that an airport stop constitutes a seizure. Most closely on point is *Reid v. Georgia*, 448 U.S. 338, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). The Court ruled that a seizure of defendants at an airport was unsupported by reasonable suspicion when based primarily on certain aspects of the drug courier profile. The lower courts had never considered whether a seizure had actually ever occurred at the initial airport stop, so the Court did not explicitly address the issue. Appellants, nevertheless, argue that the Court implicitly held that any airport stop is a seizure requiring reasonable suspicion. We find no such implication in the Court's opinion. Rather,

the majority opinion repeated *Terry*'s assertion that not all police-citizen contact invokes the Fourth Amendment. 448 U.S. at 440 n.*, 100 S.Ct. at 2753 n.*. Moreover, the concurring opinion by Justice Powell, joined by the Chief Justice and Justice Blackmun, expressly stated that the Court had not addressed the issue of whether the initial stop constituted a seizure. *See* 448 U.S. at 442–43, 100 S.Ct. at 2754–55.

Appellants venture somewhat further afield in arguing that *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), mandates holding that the initial stop here at issue was a seizure. We disagree. *Brown* involved a defendant who, after "refus[ing] to identify himself and angrily assert[ing] that the officers had no right to stop him," 443 U.S. at 49, 99 S.Ct. at 2639, was frisked and arrested for violation of a state criminal provision requiring a person to identify himself to police officers when lawfully stopped. The Court did not specifically address the question of when a seizure occurred. We agree, however, with Justice Stewart's interpretation of the opinion as holding that there was a seizure not at the initial contact between Brown and the police but at the subsequent detention after Brown refused to talk to the police. *See Mendenhall, supra*, 446 U.S. at 556, 100 S.Ct. at 1878 (plurality opinion by Stewart, J.).

Similarly, *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), another case appellants emphasize, does not mandate that all airport stops must be held seizures. In that case the Court ruled that pulling an automobile over to the side of the road constituted a seizure that was impermissible without reasonable suspicion. The Court followed the analytical approach of *Terry*, stating that "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests

---

7. Justice White dissenting, joined by Justices Brennan, Marshall, and Stevens, argued that even if the government was permitted to argue before the Supreme Court that no seizure had occurred at the initial stop, an issue it had not

presented below, the proper course would be to remand to the district court for an evidentiary hearing, not to rule on the occurrence of a seizure. 446 U.S. at 567–71, 100 S.Ct. at 1883–86.

against its promotion of legitimate governmental interests," 440 U.S. at 654, 99 S.Ct. at 1396. It then turned to an examination of the intrusiveness of the stop involved. The intrusiveness, the Court found, was substantial because pulling an automobile over to the side of the road may involve "an unsettling show of authority," interferes with freedom of movement, is inconvenient, takes up the individual's time, and "may create substantial anxiety." 440 U.S. at 657, 99 S.Ct. at 1397. The Court next rejected the State of Delaware's contention that the stops, even if intrusive, are permissible because of the state's interest in promoting the public safety on its roads. Though admitting that the state had a vital interest in regulating the use of motor vehicles on its roads, it found that "[t]he marginal contribution to roadway safety possibly resulting from a system of spot checks [could not] justify subjecting every occupant of every vehicle on the roads to a seizure ... at the unbridled discretion of law enforcement officials." 440 U.S. at 661, 99 S.Ct. at 1400.

Although we agree with appellants that *Delaware* indicates the proper analytic mode for us to follow, we do not agree that it also mandates a particular result in this case. *Delaware* certainly does not mandate that all stops by law enforcement authorities are so intrusive that they must be held seizures. The Court was careful to distinguish between the situation in *Delaware* and that in an earlier case, *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), in which the Court upheld stops of vehicles at border checkpoints without reasonable suspicion, because of the lesser degree of fright and annoyance aroused in individuals stopped in the latter situation. And we do not believe that the intrusion involved in an airport stop is necessarily identical to that involved in pulling an automobile over to the side of the road. The panoply of authority that may be present when an automobile is

pulled over—an official vehicle, flashing lights, a blaring siren—does not appear in airport stops, nor is the interference with an individual's movement, and perhaps even the time lost during a stop, the same. Moreover, the government interests involved in an airport stop differ from those in the *Delaware* opinion. Arguably, the government interest involved in interdicting drug traffic is even greater than that involved in regulating safety on roadways. Even if that is not so, the marginal value of airport stops in protecting the government interest and the array of enforcement alternatives available differ from those at issue in *Delaware*. Therefore, we conclude that *Delaware* does not mandate a particular result from balancing government interests against intrusions on individuals. *See also United States v. Mendenhall*, 446 U.S. 544, 556–57, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980) (plurality opinion by Stewart, J.).[8]

Having found no Supreme Court ruling that provides definitive guidance in our examination of whether the stop of appellants invoked the Fourth Amendment, we turn to our own cases. These also, however, though establishing a clearer line of precedent than we have gleaned from the Supreme Court's pronouncements, form a confusing thicket of opinions through which we can wend no unobstructed path. The dominant line of precedent in this Circuit begins with *Elmore v. United States*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). In that case the Court, relying on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), held that no seizure occurred when a DEA agent approached Elmore, identified himself, and asked to see Elmore's ticket. A seizure, the Court ruled, did not take place until a person's freedom was restrained. Although a seizure did occur when the

---

8. Just as *Delaware* does not control our decision here, our holding should not be interpreted as questioning holdings with different factual bases, *e.g., United States v. Costner*, 646 F.2d 234 (5th Cir. 1981); *United States v. Jones*, 619 F.2d 494 (5th Cir. 1980), in which we found that an initial stop was a seizure.

agent removed the ticket from Elmore's immediate vicinity and took it to an airline ticket counter, at that point the seizure was lawful because reasonable suspicion did exist. By implication, the Court indicated that inconsistencies between Elmore's identification and story and the name and information on the ticket provided the reasonable suspicion necessary for a seizure.

Most of our subsequent cases have followed *Elmore*. *See United States v. Sanford*, 658 F.2d 342 (5th Cir. 1981); *United States v. Setzer*, 654 F.2d 354 (5th Cir. 1981); *United States v. Smith*, 649 F.2d 305 (5th Cir. 1981); *United States v. Williams*, 647 F.2d 588 (5th Cir. 1981); *United States v. Moeller*, 644 F.2d 518 (5th Cir. 1981); *United States v. Herbst*, 641 F.2d 1161 (5th Cir. 1981); *United States v. Lara*, 638 F.2d 892 (5th Cir. 1981); *United States v. Berd*, 634 F.2d 979 (5th Cir. 1981); *United States v. Pulvano*, 629 F.2d 1151 (5th Cir. 1980); *United States v. Robinson*, 625 F.2d 1211 (5th Cir. 1980). The *Elmore* Court's conclusion is not, however, without challenge in our Circuit's decisions. A diverging line of cases begins with *United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978). A DEA agent in that case stopped Ballard though he did not resemble the characteristics of a man for whom the agent had been told to watch. The man produced no identification other than his airline ticket, was asked to accompany the agent to a DEA office, and consented to a search that revealed drugs. The panel suppressed the evidence of drugs, ruling that "[p]olice officers may briefly stop an individual if the officer reasonably suspects that the detained individual is engaged in some sort of illegal activity." 573 F.2d at 915. The stop at issue was not justified by reasonable suspicion.

The holding in *Ballard*, contrary to *Elmore* in suggesting that there could be no stops of individuals at airports without reasonable suspicion, preceded *Elmore*, but diverging decisions have continued subsequently. Although the Government in *United States v. Roundtree*, 596 F.2d 672 (5th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 96 (1979), never argued that the airport stop at issue was not a seizure, the panel's ruling in that case that the only issue was whether the initial investigatory stop was based on reasonable suspicion brought into question the validity of *Elmore*, which had been decided by the same panel only two weeks previously. Another case, *United States v. Santora*, 619 F.2d 1052 (5th Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980), a non-drug-related airport stop by FBI agents, contains language directly contrary to *Elmore* in its holding that, for an investigatory stop to be lawful, it had to be supported by reasonable suspicion. *See also United States v. Goldstein*, 635 F.2d 356, 361 (5th Cir.) (dictum), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981); *United States v. Turner*, 628 F.2d 461, 463 (5th Cir. 1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981); *United States v. Bowles*, 625 F.2d 526 (5th Cir. 1980) (noting *Elmore* undercut by *Santora*); *United States v. Fry*, 622 F.2d 1218 (5th Cir. 1980) (per curiam) (initial stop lawful; reasonable suspicion standard, if required, met).

■ Given the welter of inconsistent precedent in this Circuit and the absence of definitive guidance by the Supreme Court, we deem it advisable to reevaluate and clarify our position concerning the interplay of airport stops and the Fourth Amendment. As we noted earlier, the analytic approach for our inquiry involves weighing the intrusion on an individual's Fourth Amendment interest against the government interest. *See Delaware, supra*, 440 U.S. at 654, 99 S.Ct. at 1396; *Martinez-Fuerte, supra*, 428 U.S. at 554, 96 S.Ct. at 3081.

■ Following this analysis we conclude that airport stops of individuals by police, if of extremely restricted scope and conducted in a completely non-coercive manner, do not invoke the Fourth Amendment. The interest of the government in terminating drug smuggling is, on the one hand, very substantial. The toll on our society in lives made wretched, in costs to citizens, and in profits of gross size funnelled to the most

odious criminals, is staggering. *See Mendenhall, supra*, 446 U.S. at 561–62, 100 S.Ct. at 1881 (Powell, J., concurring in part and concurring in the judgment); *United States v. Oates*, 560 F.2d 45, 59 (2d Cir. 1977). Compounding this burden is the difficulty in interdicting a drug trade carried on by highly organized and sophisticated syndicates that are exceptionally well funded and are dealing in an easily transportable, easily hidden commodity. Informing our police that they cannot approach citizens to enlist their voluntary support in ending this trade may be tantamount to preventing its interdiction at all.

Considering on the other hand the intrusion on the individual, we believe that an airport stop need not necessarily be of so coercive a nature that communication with police cannot be voluntary. We find it possible, at least under certain circumstances, for no significant intrusion to occur. The factors the Supreme Court used in *Delaware, supra*, provide an appropriate measure for the degree of intrusion involved in an airport stop under the least coercive circumstances. In an airport stop, unlike that in *Delaware*, it is possible for a law enforcement officer not to interfere with an individual's progress in any way and to ascertain whether an individual is willing to cooperate with police before making any further inquiries. Also, there need not be the display of official authority beyond a statement that the person stopping an individual is a law enforcement officer. That statement is not alone so coercive upon the mind of an individual that we must find that it transforms an encounter into a seizure. Likewise, we believe that, by conducting the stop in an appropriately deferential manner, it is possible to avoid causing the anxiety and fear that aroused the concern of the Supreme Court in *Delaware.* Finally, we believe that the amount of time taken up in inquiring whether an individual is willing to talk to police and ascertaining

his answer may be so brief as to be insignificant.

■ Although we hold that all airport stops need not be seizures, we take care to note that we so hold only with regard to the very narrow range of stops conducted in an appropriate manner. The balance that we find between the interests of the government and the intrusion on the individual is extremely delicate. It tips in favor of holding that a seizure has occurred if there is an intrusion on the individual by law enforcement authorities that is greater than we outlined above. For reasons we present below, we believe that the difference between voluntary, unintrusive communication between police and citizens and forced interrogation by police that is so intrusive as to be a seizure, regardless of the government interests involved, rests on fine distinctions in the degree of coercion police may use in an airport stop.

■ As a broad gauge for determining when an airport stop becomes so intrusive that we must hold it to be a seizure, we adopt that proposed by Justice Stewart in *Mendenhall*: a seizure has occurred if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. at 554, 100 S.Ct. at 1877. This standard is essentially the same as that adopted in *Elmore. See Robinson, supra*, 625 F.2d at 1216.[9]

We recognize that, without elaboration, this gauge may provide insufficient guidance to the courts in determining how vigorously to inquire into whether a reasonable person would have felt free to leave police. We cannot, unfortunately, provide some talismanic test that, without more, would guide the courts in their difficult inquiry into whether a reasonable person would have felt that he was consenting voluntarily

---

**9.** Several other circuits have adopted positions similar to that which we adopt here. *See United States v. West*, 651 F.2d 71, 72–73 (1st Cir. 1981); *United States v. Patino*, 649 F.2d 724, 726–29 (9th Cir. 1981); *United States v. Wylie*, 569 F.2d 62, 67 (D.C.Cir.1977) (non-airport-stop case), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). *But see United States v. Buenaventura-Ariza*, 615 F.2d 29, 31 n.3 (2d Cir. 1980).

to interrogation by police.[10] "[W]hether a consent ... was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question to be determined from the totality of all the circumstances." *Schneckloth, supra,* 412 U.S. at 227, 93 S.Ct. at 2047. We can, however, suggest the spirit in which a court should conduct its inquiry.

Initially, we note that a court should take care zealously to guard the rights of citizens freely to give—or to withhold—consent to talk with or be searched by police. The Supreme Court has eloquently warned of the dangers accompanying too casual a review of whether consent was given voluntarily and of too great a willingness to overlook minor police infractions, with the result that, by a process of accretion, our Fourth Amendment rights may gradually be lost:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886); *see also Schneckloth, supra,* 412 U.S. at 228–29, 93 S.Ct. at 2048.

This admonition is, we believe, exceptionally cogent in the context of airport stops for, though we noted earlier that we believe they can be conducted in a fashion that prevents coercion of the individual stopped, we also note that the very nature of such stops may render them intimidating. The nervousness that air flight often engenders,[11] the need quickly to make connections for continuing one's journey, the mere surprise from being accosted in a crowded airport concourse by a law enforcement officer for no apparent reason, and the pressure to cooperate with police to avoid an untoward scene before the crowds of people, all make it easy for implicit threats or subtle coercion to exert tremendous pressure on an individual to acquiesce to the officer's wishes. In such a situation it would be easy to misinterpret acquiescence to an officer's demands as consent; acquiescence cannot, of course, substitute for free consent. *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–1792, 20 L.Ed.2d 797 (1968). Moreover, the factfinding required with regard to airport stops must involve distinguishing nuances of tone and language—whether a phrase was worded as an order or a question, whether a question was so peremptory as to be a command in all but punctuation—that are subject to easy distortion or poor recall by parties and that hence might allow covert coercion easily to escape a casual review by a court. Finally, we note that the distinction between an airport stop resulting from voluntary cooperation and even one involving a relatively slight degree of coercion that would be comparable to that which the Supreme Court held to be a seizure in *Delaware* is a fine one. Minor gradations in the degree of coercion involved in a situation

---

**10.** In the related context of determining whether confessions had been coerced out of defendants, the Supreme Court has noted that "[t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases ... where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of the accused."

*Haynes v. Washington,* 373 U.S. 503, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963).

**11.** A court must, of course, attempt to distinguish between natural, innocent nervousness and nervousness resulting from "pre-existing fear in the mind of a person possessing illegal drugs." *United States v. Turner,* 628 F.2d 461, 466 (5th Cir. 1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981).

would, therefore, differentiate a non-seizure from a substantial intrusion that would tip the balance against the government's interests and hence be a seizure.

We conclude that, in looking to the totality of circumstances of an airport stop, a court should closely scrutinize whether those circumstances reveal the presence of any coercion. If such coercion was present, the court must hold that a reasonable person would believe that his freedom had been limited. Although we cannot provide a catalog of all factors that might be relevant to a court's inquiry,[12] we can point to some specific factors that have arisen in the past on which a court should place great weight in evaluating the totality of circumstances involved in a stop. We reaffirm the holding of *United States v. Bowles*, 625 F.2d 526 (5th Cir. 1980), that blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance. Similarly, implicit constraints on an individual's freedom as would be caused by retaining an individual's ticket for more than a minimal amount of time or by taking a ticket over to a ticket counter, *see Elmore v. United States*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980), also suggest that a seizure has occurred. Also, we must properly weigh the effect of statements by officers that individuals are suspected of smuggling drugs. *See United States v. Robinson, supra*, 625 F.2d 1211, 1216–17 (5th Cir. 1980). Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention.[13] Likewise, informing an individual that an innocent person would cooperate with police, as occurred in *United States v. Setzer*, 654 F.2d 354 (5th Cir. 1981), and *United States v. Williams*, 647 F.2d 588 (5th Cir. 1981), would, we believe, call seriously into question the voluntariness of consent; the coercive effect of an intimation that failure to respond is an indication of guilt is evident.

Finally, we have noted the concern the Supreme Court has expressed regarding the intrusiveness of police detention, a concern founded on the role of the Fourth Amendment in protecting the privacy of individuals: the greater the intrusion, the greater the privacy interest affected. We believe this concern equally applicable to an inquiry into the voluntary nature of consent to a police request. The more intrusive on an individual's freedom complying with a request would be, the greater should be the skepticism with which a court treats assertions that an individual consented to a request. A court, therefore, should analyze with care evidence of consent to a search or to a request to accompany an agent to an office.

We observe that the evidence usually reflects the DEA's salutary practice

---

12. For other relevant factors *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (youth, lack of education, low intelligence, length of detention, repeated questioning); *United States v. Mendenhall*, 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.) (several officers present, display of weapon, physical touching of person, language or tone of voice). Though the testimony of third parties, such as the skycap in this case, that they thought appellants had been arrested would not, as Amici argue, militate a holding that a seizure had occurred, it would be relevant to the court's inquiry.

13. *Cf. United States v. Jordan*, 557 F.2d 1081, 1083 (5th Cir. 1977) (whether investigation has focused on defendant is one factor to consider in determining whether *Miranda* warnings should be given). Appellants assert that stopping an individual in order specifically to attempt to show that he is smuggling drugs should be cause for finding that a seizure occurred. We do not believe this factor alone sufficient for showing that cooperation with police was coerced. A person may well be as eager to cooperate with police in proving his own innocence as he would be to assist police in proving the guilt of someone else. Also, such a requirement has not been adopted with respect to consent to searches. *See Schneckloth, supra*. Difficulties in determining whether a person voluntarily agreed to talk to police should be no worse than, and require a bright-line standard no more than, determining whether consent to a search was voluntary.

of informing individuals that they are free to refuse consent to a search and to contact a lawyer.[14] *See, e.g., Elmore, supra; Robinson, supra.* Although such evidence does not absolutely prove uncoerced consent,[15] it does in many instances assuage the fear of a court that an individual was intimidated into consent to a search.[16] Our concern, therefore, is greater when police ask individuals to accompany them to an office, since in such instances there appears to be no practice of informing them they need not agree to go to the office. We do not wish to shackle police absolutely to a rigid and awkward rule requiring them to inform individuals that they are free to not accompany police to an office, but we do believe that only exceptionally clear evidence of consent should overcome a presumption that a person requested to accompany an agent to an office no longer would feel free to leave. Such a request combines a substantial intrusion on an individual's freedom, a marked increase in the coercive nature of the environment in which the individual will be responding to police, and substantial psychological coercion from the intimation that there is strong suspicion that an individual is involved in a criminal act.

Silently following an officer would rarely constitute sufficient evidence of consent under almost any circumstances. *See Bumper v. North Carolina*, 391 U.S. 543, 548–59, 88 S.Ct. 1788, 1791–1792, 20 L.Ed.2d 797 (1968); *United States v. Hill*, 626 F.2d 429 (5th Cir. 1980). Even verbal agreement to accompany an officer should be scrutinized exceptionally closely to ensure a complete absence of coercive influence.

### C.

Once a stop has been held a seizure, it can be constitutional only if based upon reasonable suspicion. The Supreme Court has defined reasonable suspicion as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). A recurring issue in applying this standard to airport stop cases is whether police have a reasonable suspicion for stopping an individual who meets characteristics of the drug courier profile, which is a series of characteristics that the DEA believes many drug smugglers meet. The precise characteristics in the profile appear to vary,[17] but those most commonly

---

14. Similarly, not apprising a suspect of his right to refuse consent to a search, though a factor in any inquiry into the voluntariness of consent, is not completely determinative of the coercion involved in obtaining that consent. *Schneckloth, supra*, 412 U.S. at 226–27, 93 S.Ct. at 2047.

15. The courts should be careful to distinguish situations in which an individual initially consents to a search in an airport concourse, is taken to an office, and is then told that he may refuse consent to search and may contact an attorney from situations in which the person is initially, before being taken to an office, told of his rights to refuse consent and to contact an attorney. In the former, the possibility of coerced initial consent, and resulting involuntary detention when the individual is taken to an office, is greater since the safeguards produced by informing an individual of his rights do not exist.

16. We think it strikingly unusual that so many individuals stopped at airports consent to search while carrying drugs and even show where they have hidden drugs. *See, e.g., United States v. Setzer*, 654 F.2d 354 (5th Cir. 1981); *United States v. Pulvano*, 629 F.2d 1151

(5th Cir. 1980). Though "the question is not whether respondent acted in her self-interest [by consenting to a search], but whether she acted voluntarily," *United States v. Mendenhall*, 446 U.S. 544, 559, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) (plurality opinion by Stewart, J.), *see also Pulvano, supra*, 629 F.2d at 1157 n.8, the courts should consider how reasonable a story is in determining whether consent was given voluntarily. *See Higgins v. United States*, 209 F.2d 819, 820 (D.C.Cir.1954).

17. The drug courier profile varies from airport to airport. *See United States v. Rico*, 594 F.2d 320, 325 (2d Cir. 1979) (LaGuardia Airport, New York City) (profile factors: (1) carrying little baggage, (2) nervousness, (3) checking to see if being followed, (4) attempts to leave airport immediately, (5) unusual dress, (6) no tags on luggage, (7) attempts by individuals to conceal their travelling together); *United States v. Ballard*, 573 F.2d 913, 914–15 (5th Cir. 1978) (New Orleans) (profile factors include: (1) nervousness, (2) little or no luggage, (3) large amounts of cash in small bills, (4) unusual itinerary, (5) arriving from source city, (6) paying for ticket in small bills, (7) one-way ticket, (8) use of alias, (9) false telephone number on

mentioned in cases in this Circuit as constituting the profile are described in *Elmore v. United States*, 595 F.2d 1036, 1039 n.3 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980):

> The seven primary characteristics are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itinerary, such as rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.
>
> The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities.

The Supreme Court has most directly addressed the use of the drug courier profile as grounds for reasonable suspicion in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In that case, the evidence of suspicious activity was that defendants walked in a suspicious manner and matched certain profile characteristics: arrived from a known drug center, apparently tried to conceal that they were traveling together, took an early morning plane, and carried no luggage except for shoulder bags. For the most part, those circumstances the Court noted, the listed "circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." 448 U.S. at 441, 100 S.Ct. at 2754. The seizure was held to be, as a matter of law, not based on reasonable suspicion.[18]

The Supreme Court left unaddressed the proper use of profile characteristics by a court in determining the basis for a stop. Our own fear concerning use of the profile by the courts automatically to establish reasonable suspicion we have previously expressed: because most of the characteristics are applicable as much to innocent as to suspect individuals, the mechanistic use of the profile by the courts without examining the totality of the circumstances could result in blanket approval of police seizures of innocent citizens. *United States v. Pulvano*, 629 F.2d 1151, 1155 n.1 (5th Cir. 1980). Compounding this fear is the facility with which profile characteristics may be manipulated by overzealous law enforcement officers.[19] This Court has, consequently, indicated that a match between the defendant and the drug profile characteristics, of it-

---

flight reservation, (10) placing call immediately on arrival, (11) travel by known trafficker); *United States v. McCaleb*, 552 F.2d 717, 719–20 (6th Cir. 1978) (Detroit Airport) (profile factors include: (1) buying ticket with small bills, (2) travel to or from drug centers in short time period, (3) empty suitcase or luggage, (4) nervousness, (5) use of alias); *United States v. Craemer*, 555 F.2d 594, 595 (6th Cir. 1977) (Cleveland Airport) (profile characteristics include: (1) purchase of round-trip ticket to and from drug distribution center, with short stay between flights, (2) purchase of tickets with small or large bills, (3) checking no luggage or empty bags, (4) use of aliases, (5) suspicious or nervous behavior).

18. Justice Powell, joined by the Chief Justice and Justice Blackmun, who found that a reasonable suspicion existed on the facts in *Mendenhall*, stated in his concurrence in *Reid* that the "fragmentary facts" available could not provide a basis for reasonable suspicion. *Reid, supra*, 448 U.S. at 442 n.1, 100 S.Ct. at 2754 n.1.

19. See, e.g., *United States v. Pulvano*, 629 F.2d 1151, 1155 n.1 (5th Cir. 1980) ("A review of the cases in which this profile has been used, as well as the direct testimony of [a DEA agent], convinces us of the tragic fact that every major population center in this country has become a haven for drug traffickers"; also giving individual's dishevelled appearance as one element of profile causing stop at Atlanta airport though style of dress not a factor in Atlanta drug courier profile.)

self, does not necessarily provide reasonable suspicion. *See, e.g., United States v. Herbst*, 641 F.2d 1161, 1167 (5th Cir. 1981);[20] *Elmore, supra; United States v. Ballard*, 573 F.2d 913, 915 (5th Cir. 1978). We have also on occasion, however, intimated that a stop based on the profile might be upheld. *See United States v. Fry*, 622 F.2d 1218, 1221 n.2 (stop lawful; reasonable suspicion, even if required, existed; basis for suspicion seemed based on drug courier profile characteristics); *see also United States v. Turner*, 628 F.2d 461 (5th Cir. 1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981) (implicitly allowing profile to be the basis for reasonable suspicion). Most recently a panel of this Court stated that certain characteristics that were in the drug courier profile, coupled with extreme nervousness on the part of the individual, constituted a basis for reasonable suspicion. *United States v. Sanford*, 658 F.2d at 346. Judge Randall noted in a partial dissent in that case, however, that nervousness is one of the profile factors, not a factor apart from the profile.

■ We use the opportunity presented by the occasion of this en banc sitting to consider the proper role of the profile characteristics in a court's determination of the existence of reasonable suspicion. We conclude that the profile is nothing more than an administrative tool of the police.[21] The

presence or absence of a particular characteristic on any particular profile is of *no* legal significance in the determination of reasonable suspicion.

■ Two consequences stem from this holding. First, a match between certain characteristics listed on the profile and characteristics exhibited by a defendant does not automatically establish reasonable suspicion. *United States v. Sanford*, 658 F.2d at 346; *United States v. Herbst*, 641 F.2d at 1167. Rather, critical to any finding that reasonable suspicion existed is an evaluation of "the reasonableness of a particular search or seizure *in light of the particular circumstances.*" *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (emphasis supplied). Subsequent cases have elaborated on this holding and have required that the suspicion must be focused on the particular individual seized. "[S]ome quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 116 (1976); *cf. Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (probable cause finding must be particularized with respect to person); *see also Delaware v. Prouse*, 440 U.S. 648, 654–55 (1979).[22] Any checklist of suspicious char-

**20.** For cases in other circuits invalidating use of the drug courier profile, *see, e.g., United States v. Rico*, 594 F.2d 320, 326 (2d Cir. 1979); *United States v. Smith*, 574 F.2d 882, 884 (6th Cir. 1978); *see also United States v. Vasquez-Santiago*, 602 F.2d 1069, 1072 (2d Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980) (noting seizure not merely result of adherence to drug courier profile); *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir. 1977); *United States v. Scott*, 545 F.2d 38, 40 n.2 (8th Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977) (noting certain profile characteristics of little value).

**21.** We recognize the administrative utility of the drug courier profile in guiding law enforcement officers toward individuals on whom the officers should focus their attention in order to determine whether there is a basis for a specific and articulable suspicion that the particular individual is smuggling drugs.

**22.** The Supreme Court has noted that "the Fourth Amendment imposes no irreducible requirement of [individualized] suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). The Court has, however, sanctioned seizures or searches without individualized suspicion only in usual situations involving minimal intrusions and in which individuals are not singled out for the intrusion. *See id.* (stop of automobiles at checkpoint close to border); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (area warrant to search buildings for housing code violations). *See also Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) ("In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official on the field' ") (footnote omitted) (quoting *Mar-*

acteristics cannot be mechanically applied by a court to determine whether a particular search or seizure meets the Supreme Court's standards. A profile does not focus on the particular circumstances at issue. Nor does such a profile indicate in every case that a specific individual who happens to match some of the profile's vague characteristics is involved in actions sufficiently suspicious as to justify a stop.

 The second consequence of our holding flows from the first. Although a match between a defendant's characteristics and some of the characteristics on a drug courier profile does not automatically support a finding of reasonable suspicion, the fact that a characteristic of a defendant also happens to appear on the profile does not preclude its use as a justification providing reasonable suspicion for a stop. If an officer can demonstrate why some factor, interpreted with due regard for the officer's experience and not merely in light of its presence on the profile, was, in the particular circumstances of the facts at issue, of such import as to support a reasonable suspicion that an individual was involved in drug smuggling, we do not believe that a court should downgrade the importance of that factor merely because it happens to be part of the profile. Our holding is only that we will assign no characteristic greater or lesser weight merely because the characteristic happens to be present on, or absent from, the profile.

### D.

Up to this point we have been concerned with distinguishing the first two levels of the three tiers of police-citizen contact carved out by *Terry*. We now proceed to consider the difference between the second and third tiers of police-citizen contact: the seizure, requiring only reasonable suspicion, and the arrest, requiring probable cause. The particular issue that generally arises during airport stops, and which we address here, is whether individuals are seized or whether they are subject to a detention that is tantamount to an arrest if they must, without their consent, accompany police to an airport office.

Two considerations circumscribe the limits of what police may do during the encounter that leads to a seizure. First is the balancing test, which we used earlier in distinguishing non-seizures from seizures, weighing the government interest involved against the intrusion on the individual. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *Terry, supra*, 392 U.S. at 20–22, 88 S.Ct. at 1879–80.[23] In presenting their position on which way the balance of interests must fall if they are held involuntarily to have gone to the DEA office, appellants rely heavily on *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In that case police investigating a murder took the defendant into custody, concededly without probable cause. Police did not tell Dunaway that he was under arrest, drove him to police headquarters in a police van, placed him in an interrogation room, and questioned him after giving *Miranda* warnings. The Court, emphasizing the limited nature of the intrusion allowed in *Terry* and how close the facts at issue were to a traditional arrest, concluded that the intrusion at issue was so great that it must be justified by probable cause.

Appellants argue that the similarity of any involuntary journey to a private office to the facts of *Dunaway* is so great that,

*tinez-Fuerte, supra*, 428 U.S. at 560, 96 S.Ct. at 3084; *Camara, supra*, 387 U.S. at 532, 87 S.Ct. at 1732). Seizures resulting from non-border stops at airports are, we believe, substantially more intrusive than building inspections or border stops. We cannot allow such seizures without some individualized reasonable suspicion.

23. Appellants argue that, in *Dunaway v. New York*, 442 U.S. 200, 213–14, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979), the Supreme Court invalidated use of a balancing test in determining whether a seizure was valid. In *Dunaway*, however, the Court merely invalidated a case-by-case balancing test of "reasonable police conduct under the circumstances". *Id.* at 213, 99 S.Ct. at 2257. The decision did not invalidate balancing tests in evaluating a general police practice for which the result would not vary with each case.

despite the strong government interest in suppressing drug smuggling, such a journey must be held no mere seizure but an actual arrest. Their argument is not without support. Justice Stewart's opinion in *Mendenhall* rejected an appellate court's conclusion that the trip to the DEA office constituted an arrest, but did so only because Mendenhall's actions, under the circumstances, constituted consent to a request to accompany the DEA agents to the office. The opinion does not intimate that, absent consent, a forced trip to the office would be anything less than the equivalent of an arrest. The dissent of Justice White in *Mendenhall*, joined by Justices Marshall, Brennan, and Stevens, explicitly equated the situation in *Mendenhall* with that in *Dunaway*, and hence required probable cause. *United States v. Mendenhall*, 446 U.S. 544, 574–77, 100 S.Ct. 1870, 1887–89, 64 L.Ed.2d 497 (1980). Finally, this Court has itself recently held that requiring an individual to proceed against his will from an airport concourse to an office for further interrogation constitutes a seizure equivalent to an arrest that must be justified by probable cause. *United States v. Hill*, 626 F.2d 429, 433–37 (5th Cir. 1980). *See also United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir. 1979).

We find appellants' arguments persuasive. We commented earlier on the exceedingly strong government interest in ending trafficking in drugs, and we sympathize with the plight of police in carrying out their difficult tasks. Nevertheless, however great is the government interest, and however great the difficulty in ending drug smuggling, we cannot use those reasons as an excuse for suspending the Fourth Amendment. Although the intrusion involved in being required to walk to a nearby office is perhaps somewhat less than the ride in a police van to a police station that occurred in *Dunaway*, we believe it sufficiently great that it is tantamount to an arrest. Requiring an individual to accompany police to an office indicates a detention for a time period longer than that permitted in a seizure; cuts the individual off from the outside world, without indication of when he might be allowed to leave; places him in unfamiliar surroundings; may subject him to increased implicit police pressure; and leaves him without third parties to confirm his story of events that may have occurred, should his story differ from that of police. Such a detention, if not by consent—and, as we noted earlier, courts should scrutinize exceptionally closely whether consent in fact was voluntary in such situations—we believe is only constitutional if accompanied by probable cause.

Our conclusion is buttressed by a second consideration limiting the scope of police seizures. In *Terry*, the Supreme Court was careful to note not only that the initial intrusion must be based on a reasonable suspicion, but also that "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." 392 U.S. at 19, 88 S.Ct. at 1878. Similarly, in *Brignoni-Ponce, supra*, 422 U.S. at 881–82, 95 S.Ct. at 2580, the Supreme Court, though concluding that the government interest in stemming the flow of illegal aliens into the United States was sufficient to permit brief stops of automobiles near the border on the basis of mere reasonable suspicion, stated that a police officer could only "question the driver and passengers about their citizenship and immigration status, and . . . ask them to explain suspicious circumstances." The Court explicitly stated that "any further detention or search must be based on consent or probable cause." In the context of airport stops, we can discern no justification tying the rationale for initiating the stop to the expanded scope of forced detention in a private office. The limited interrogation permissible during a seizure can be conducted as well in an airport concourse as in an office, as can a request for consent to a search.[24] In order to expand the scope of

---

**24.** The government in the past apparently has argued that security reasons, ease of conversation, the need to preserve the anonymity of agents by avoiding attracting attention to them, and the desire to lessen the humiliation to the suspect provided reasons for allowing agents to take an individual to an office during a seizure. *See* Note, "Fourth Amendment—Airport

an intrusion to include bringing an individual involuntarily from an airport concourse to an office, an officer must therefore have probable cause.

### E.

We now must apply to the facts of this case the conclusions we have drawn from our examination of the law governing airport stops. The district court, ruling before our decision in *Elmore v. United States*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980), found the initial airport stop of appellants to be a seizure. Given our holding today, we must reevaluate the facts of this case.

 We first determine whether the initial stop of Berry was a seizure. We note that the agents stopped Berry's progress toward a taxi stand, but find no evidence of coercion on the record. The agents merely identified themselves and asked if they could talk with Berry. Appellants contend that we should find a seizure at the initial stop of Berry because the agents had singled out appellants as suspected drug smugglers. We find that fact alone, absent evidence that the agents' impression had been conveyed to Berry, to be insufficient cause to find that a seizure had occurred. We agree with the finding of the magistrate that there was no seizure during the initial contact between the agents and Berry.[25]

 We find no seizure at least until Berry, complying with a request, showed Markonni his driver's license and admitted that he and Zabish actually were traveling together.[26] By that time Markonni knew that appellants matched some characteristics of the drug courier profile, were trying to hide their joint travels, and were traveling under aliases. He also knew that he had been told to watch for one Dudley Berry, a drug smuggler, and that the real name of the individual he had stopped was Dudley Berry. Considering these factors in light of the particular circumstances in which they appeared in this case, we believe that they could serve as the basis for a reasonable suspicion focused on Berry that would justify a seizure. The fact that certain characteristics happen to match the drug courier profile, of course, does not of itself establish reasonable suspicion.[27] Critical considerations, however, are that Berry initially misled Markonni concerning his traveling companion and concerning his true identity. These considerations are particularly striking in this case since they did not arise merely because of vaguely suspicious movements by appellants that might be interpreted as an attempt to dissociate one appellant from the other, nor did they arise merely because of, for example, innocuous inconsistencies between names on luggage tags and on tickets. Rather, Berry was deliberately and clearly attempting to

Searches and Seizures: Where Will the Court Land," 71 J.Crim.L. & Criminology 499, 507 n.4 (1980). Though it is arguable that security reasons might justify taking a suspect to an office during a seizure, *see United States v. Oates*, 560 F.2d 45 (2d Cir. 1977) (suspects believed armed), circumstances indicating such a justification would be exceptional. We have difficulty believing the noise level in an airport to be so high as to prevent normal uncoercive conversation. We also doubt that a short interrogation, normally the only police action in an airport seizure unless a person consents to a full body or luggage search, would either destroy an agent's anonymity or cause an individual significant humiliation.

25. Though we could remand to the district court for review of the magistrate's findings, we have authority to review those findings ourselves in the interests of judicial economy.

*United States v. Lewis*, 621 F.2d 1382, 1386 (5th Cir.), *cert. denied*, 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1980).

26. Appellants do not assert that Markonni retained the tickets Berry had produced, which apparently were no longer necessary for appellants' trip, while asking Berry for further identification. Retention of tickets, especially if necessary in order to continue a trip, would, we believe, strongly indicate that a reasonable person would believe his freedom restrained.

27. Aside from use of an alias, which we consider independently of the drug courier profile, the only profile characteristics relevant to this stop were arrival from Miami, a drug center; nervousness; and use of public transportation. By themselves these characteristics are entirely consistent with innocence.

mislead a law enforcement officer. A final critical factor is Markonni's knowledge that Berry had the name of a man for whom he had been told to watch. We find no seizure before reasonable suspicion existed. After there was reasonable suspicion any subsequent seizure was justified.

■ Turning to Zabish, we believe that she was seized when officer Denton came over to her, perhaps touched her elbow, pointed toward Markonni and Berry, and asked her to join them, while at the same time Markonni was motioning to her to join them. Even if the agents were not in uniform, as apparently was the case, the situation appears closer to a command than to a request with which a reasonable person would believe he could freely comply or not. *See United States v. Palmer,* 603 F.2d 1286, 1288–90 (8th Cir. 1979) (motioning and calling to defendant to cross street and join police officer held a seizure). Markonni was aware that Berry was trying to conceal traveling with Zabish, that she was unlikely to be the Sarver on the ticket, and that she was accompanying a person with the name of a man for whom he had been told to watch. As with Berry, those factors gave reasonable suspicion for a seizure.

■ The magistrate found that when Markonni had "asked" appellants to accompany him to the DEA office he actually had seized them. Having reviewed the record, we agree with the magistrate's finding that appellants did not voluntarily comply with Markonni's request that they accompany him to the DEA office. Appellants, being aware that Markonni knew that they had falsely identified themselves to him, and having been asked by him whether they were smuggling drugs, could not be held voluntarily to have consented to go to the office. We disagree with the magistrate's conclusion that being required to go to the DEA office was merely a seizure. Given our discussion earlier, we must find the forced walk to the office to be tantamount to an arrest and so to require probable cause.

■ Although it is likely that appellants' violation of Georgia law by falsely identifying themselves to police officers [28] would provide the probable cause necessary for the office detention,[29] we need not reach that issue. The district court found that the voluntary consent of appellants was sufficient to remove the taint of an unlawful seizure. We believe that finding equally applicable to an unlawful arrest, and we also believe the evidence justifies the district court's finding.

In order to eliminate any taint from an involuntary seizure or arrest, there must be proof both that the consent was voluntary and that it was not the product of the illegal detention.[30] *See Dunaway v. New York,* 442 U.S. 200, 216–19, 99 S.Ct. 2248, 2258–60, 60 L.Ed.2d 824 (1979); *United States v. Robinson, supra,* 625 F.2d 1211,

---

**28.** We note that an issue may arise concerning whether Markonni should have given Zabish *Miranda* warnings before asking for her name. Although we do not reach the issue because of our holding that appellants' consent to a search eliminated the taint of an illegal seizure, we point out that the Supreme Court mentioned no need for *Miranda* warnings in other seizure cases. *See Brignoni-Ponce, supra; Delaware, supra.* Moreover, this Court has recently held that a police officer, informed that men were passing bills believed to be counterfeit, could direct the men over to his automobile and ask questions without giving *Miranda* warnings. *United States v. Rice,* 652 F.2d 521 (5th Cir. 1981). Those facts are close to those at issue here.

**29.** In oral argument before the panel initially deciding this case on appeal, appellants argued that Markonni, as a federal agent, had no authority to make an arrest under the Georgia statute. *United States v. Berry,* 636 F.2d 1075, 1079 n.4 (5th Cir. 1981). Although we do not reach this issue, we note that we have upheld an arrest on the basis of the statute previously. *United States v. Pulvano,* 629 F.2d 1151, 1155–56 (5th Cir. 1980).

**30.** Appellants were restrained in a manner that was tantamount to an arrest and were not read *Miranda* warnings before being asked to consent to a search. We have held, however, that the absence of *Miranda* warnings is not determinative in deciding whether consent to a search was voluntary. *United States v. Garcia,* 496 F.2d 670 (5th Cir. 1974) (en banc). We do not find the absence of the warnings to be a sign of coercion in this case.

1219–20 (5th Cir. 1980). Among the factors noted by the *Dunaway* Court, citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), are the temporal proximity of an illegal arrest and confession, intervening circumstances, and the purpose and flagrancy of the official misconduct. 442 U.S. at 218, 95 S.Ct. at 2260. We believe, on the facts of this case, that the consent was both voluntary and not the product of an illegal detention. Although the request to go to the office and the consent were close in time, there were substantial intervening circumstances. That appellants were told that they were free to refuse consent to a search and that they could consult with an attorney is a factor, although it is not alone determinative of our holding that the taint of any illegal arrest was attenuated. Critical considerations are that appellants were allowed to consult with each other, and that Markonni invited them to use a telephone when Zabish indicated that she might want to contact an attorney. Moreover, as we have noted, probable cause at least arguably did exist that would justify the detention of appellants.

### III.

Each appellant also brings forward independent claims, aside from those pertaining to the Fourth Amendment, relevant to his or her separate trial. Considering first the claims of Zabish, we agree with the panel below that the district judge was correct in excluding as hearsay an exculpatory statement concerning Zabish made by Berry to Denton. Zabish claims that the statement was not offered for the truth of the matter asserted and so was not within the definition of hearsay in Federal Rule of Evidence 801(c).[31] She, however, provides, and we can discover, no justification for the statement other than for the truth of the matter asserted. There also is apparent no other hearsay exception into which the statement might fall.

Zabish also argues that her due process rights were violated when she was not provided with "drug standards," which are pure quantities of a drug used for comparison with the chemical composition of a seized drug. We rejected this contention in *United States v. Gaultney*, 606 F.2d 540, 545–46 (5th Cir. 1979), *reversed on other grounds sub nom. Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). We reject it here.

Moving on to Berry's other claims, we reject his contention that, because the court did not allow Denton to testify concerning Berry's statements exculpating Zabish, Berry was forced to take the stand to testify at Zabish's trial after his conviction but prior to his sentencing. Nor do we find that his Fifth Amendment rights were violated when he was granted immunity and required to testify at Zabish's trial concerning a crime for which he had not been charged. Berry, however, waived what rights he might have under the Fifth Amendment when he filed with the court an affidavit stating that he would testify in Zabish's behalf if appellants' trials were severed and his was held first. In any event, we find no evidence that Berry's testimony at Zabish's trial was considered by the judge at sentencing.

Berry's next arguments, that he was prejudiced by the government's failure to disclose items such as an infrared spectogram, a chemist's personal work notes, and a "Drug Enforcement Administration Analytical Manual," also must fail. The magistrate's finding that his order had been satisfied, the spectogram's general availability as a reference standard, the absence of any need for the work notes since Rule 16's requirement that results or reports of any examinations be disclosed provided Berry with whatever relevant information the notes might contain, and the district court's ruling that the manual was irrelevant, all indicate that the district court did not abuse its discretion in holding that the govern-

---

**31.** Fed.R.Evid. 801(c) provides:
 "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

ment had adequately complied with both Fed.R.Crim.P. 16 and the magistrate's disclosure order.

 Finally, we agree with the panel opinion that alleged errors of the district court concerning sequestration of appellants' expert witness, limitations on the discussion of different kinds of cocaine, and allowing the use of certain rebuttal evidence are without merit. The alleged errors all concern action within the discretion of the trial court.

The judgment of the district court in each case is AFFIRMED.

HILL, Circuit Judge, dubitante:

The majority opinion authored by Judge Johnson is a major contribution to the jurisprudence in a difficult area. I concur except for the reservation of some doubt raised by the opinion of Judge Anderson. I agree with Judge Anderson that *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), would require us to affirm a finding by the district judge that appellants consented to accompany the agents to the DEA office. Yet, here, there was no finding, one way or the other, on that question. The district judge, having concluded that appellants had been taken into custody at an earlier point, did not reach it.

Were it necessary to our judgment, I should opt for remanding that question for initial decision by the trial judge, as suggested in the final paragraph of what Judge Anderson has written. I should not remand, however, because a resolution of the issue, either way, would not affect our judgment.

R. LANIER ANDERSON, III, Circuit Judge, joined by FAY, Circuit Judge, specially concurring:

I concur in the judgment affirming the convictions of appellants Berry and Zabish, and I concur in most of the comprehensive

and scholarly majority opinion. However, I respectfully disagree with the majority's conclusion that the appellants did not voluntarily consent to accompany the agents to the DEA office. Because I conclude that appellants did voluntarily consent to go to the DEA office, I would not reach the issue addressed in part II.D. of the majority opinion, *i.e.*, whether individuals who accompany agents to an airport office, without their consent, are subject to a detention that is tantamount to an arrest requiring probable cause.

In my opinion, *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), requires the conclusion in this case that Berry and Zabish voluntarily consented to accompany Agent Markonni to the DEA office.[1] The relevant *Mendenhall* facts include: (1) the agent knew and Mendenhall knew that the agent knew that Mendenhall was traveling under an alias; (2) the agent then specifically identified himself as a narcotics agent, and Mendenhall became quite shaken and extremely nervous; (3) the agent asked Mendenhall if she would accompany him to the DEA office for further questions; (4) she did follow the agent to the office, although the record does not indicate that she ever verbally agreed to do so; and (5) Mendenhall was not "advised" that she was free to decline to accompany the agent to the DEA office.

The relevant facts in the instant case include: (1) The agent knew that Berry and Zabish were traveling under an alias, and they knew the agent knew. In the instant case there is the additional fact that Berry and Zabish lied to the agent when they initially misidentified themselves. (2) In addition to identifying himself as a narcotics agent, Markonni in this case asked appellants if they were carrying drugs, to which Berry responded in the negative. (3) Agent Markonni asked these appellants to accompany him to the DEA office, apparently in much the same manner as occurred

1. Five justices concurred in the *Mendenhall* holding of voluntary consent to accompany the narcotics agent to the DEA office.

in *Mendenhall.* (4) Appellants not only followed the agent to the office, but in addition, Berry affirmatively agreed to go to the DEA office, which is more favorable to the government than *Mendenhall*'s acquiescence by simply following the agent to the office. (5) Apparently neither Berry nor Zabish were advised that they had a right to decline to go to the DEA office.

In my opinion, the facts of Mendenhall's consent to go to the DEA office cannot be distinguished satisfactorily from the instant facts. It is true that Markonni specifically asked whether these appellants were carrying drugs. Although this specific question was not asked in *Mendenhall*, the agent did specifically identify himself to Mendenhall as a federal narcotics agent, in response to which Mendenhall "became quite shaken, extremely nervous." 446 U.S. at 548, 100 S.Ct. at 1874. When a known narcotics agent asks a shaken and nervous Mendenhall to accompany him to the DEA office "for further questions," 446 U.S. at 548, 100 S.Ct. at 1874, the effect on Mendenhall seems to me insignificantly different from the effect on Berry and Zabish of the specific question about carrying drugs.

It is also true that the majority in the instant case conclude that at least Zabish was seized prior to being asked to go to the DEA office, whereas in *Mendenhall* there was no finding by the majority that there had been a seizure. However, Justice Powell, with whom the Chief Justice and Justice Blackmun concurred, assumed there had been a seizure in *Mendenhall*, without affecting their concurrence in the majority's finding that Mendenhall voluntarily consented to go to the DEA office. The facts of the instant case which the majority emphasize in finding that Zabish was seized— that Officer Denton came over to Zabish, perhaps touched her elbow, pointed toward Markonni and Berry, and asked her to join them, while at the same time Markonni was motioning her to join them—do not, in my judgment, add significantly to a coercive atmosphere that would negate consent. More importantly, the totality of the circumstances here seem to be at least as lacking in coercion, and at least as indicative of voluntary consent, as in *Mendenhall.* A crucial fact here which is more favorable to a finding of voluntary consent is that Berry did in fact agree, in the presence of Zabish, to accompany the officers to the DEA office. That affirmative agreement was absent in *Mendenhall*, and had to be inferred from the totality of the circumstances, including the fact that she did acquiesce.

*Mendenhall* might also be distinguished because the Supreme Court merely sustained a district court finding of fact in this regard. However, if that is the only distinction, it seems to me that we could only remand for findings by the district court in light of the *Mendenhall* standard. I respectfully suggest that we should not, at the appellate level, make a finding of fact that the consent of these appellants was involuntary, when the Supreme Court has sustained a finding of voluntary consent on indistinguishable facts.

THOMAS A. CLARK, Circuit Judge, dissenting:

I dissent. The majority has focused upon fourth amendment concerns. I fear, however, that a significant fifth amendment question has been dismissed in passing.

I would hold that from the moment that Markonni stopped Berry's progress toward the taxicab a custodial interrogation was underway. The detention of Berry and Zabish was custodial according to the factors enunciated in *United States v. Jonas*, 639 F.2d 200, 203 (5th Cir. 1981)[1]:

In determining whether an interrogation occurred in a custodial context, thus requiring a *Miranda* warning, this court employs a four factor test: (1) whether probable cause to arrest had arisen; (2) whether the officer intended to hold the defendant; (3) whether the defendant believed that his freedom was significantly restricted; and (4) whether the investigation had focused on the defendant.

1. *See also Alberti v. Estelle*, 524 F.2d 1265 (5th Cir. 1975).

639 F.2d at 203.[2] Testimony of Agent Markonni implies that he considered Berry to be in custody from the moment he was stopped.[3] Further, Berry could not have reasonably felt that he was free to leave.[4] Additionally, in the instant case Berry was the focus of an investigation. These factors, taken together, establish that Berry was in custody from the moment he was approached by Markonni.

There is no question that Berry was being interrogated. The recent Supreme Court decision in *Rhode Island v. Innis*, 446 U.S. 291, 301–02, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980), defines interrogation for fifth amendment purposes. The Court states, "a practice that police should know is reason-ably likely to evoke an incriminating response from a suspect thus amounts to an interrogation."[5] Given the massive number of similar situations Agent Markonni has been involved in, surely it cannot be maintained that Markonni did not intend and expect to evoke an incriminatory response from Berry. Thus, under *Innis*, Berry was under interrogation.

Since Berry was undergoing a custodial interrogation, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), should apply to the instant case. Thus, I would hold that since *Miranda*-type warnings were not given to Berry, evidence obtained by Markonni after the initial stop should be suppressed.[6]

**2.** In the instant case, point one of the above analysis is inapplicable as it is clear probable cause did not exist.

**3.** The following exchange occurred during the testimony of Agent Markonni:

Q ... How many people—of those people that were stopped, which we know is a number that we don't have, but are you aware of how many were, in fact, searched that were stopped?

A A good percentage—a very, very good percentage of the people that were stopped were searched.

Q Approximately what percent?

A I don't know. I'd say probably eighty percent or better....

*See* Supp. Record, vol. 2 at 59. Markonni indicated that only about half of the people he searches consent to the search. As to the other half, they are searched pursuant to an arrest. *Id.* at 60.

**4.** I cannot accept the proposition that Berry, who had his progress towards the taxicab stopped by Markonni, could have possibly felt that he was free to leave. I would hold that when an individual is approached by a police officer under similar circumstances he does not feel that he may walk away. In accord with this position: W. LaFave, Searches and Seizures 50 (1978); *United States v. Collis*, 528 F.Supp. 1023, 30 Crim.L.Rep. 2328 (E.D.Mich. 1981); *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882 (N.D.Ill.1975).

**5.** 446 U.S. at 301–02, 100 S.Ct. at 1690.

**6.** I realize that, at first blush, this may appear to place a burden on Markonni's commendable efforts in suppressing the drug trade. However, I would suggest a simple solution to avoid the custodial interrogation problem. A Drug Enforcement Administration agent could sim-ply preface any questions to an individual with a comment that the individual need not speak with him. If, however, the agent did not want to offer the detainee such an option, *Miranda* warnings should be required. Support for this proposition may be found in Am.L.Inst., Model Code of Pre-Arraignment Procedure § 110.2(5) (1975), *reprinted in* C. Whitebread, Constitutional Criminal Procedure 159 (1978):

(5) *Questioning of Suspects.*

(a) *Warnings.* If a law enforcement officer stops any person who he suspects or has reasonable cause to suspect may have committed a crime, the officer shall warn such person as promptly as is reasonable under the circumstances, and in any case before engaging in any sustained questioning

(i) that such person is not obliged to say anything, and anything he says may be used in evidence against him,

(ii) that within twenty minutes he will be released unless he is arrested.[,]

[(iii) that if he is arrested he will be taken to a police station where he may promptly communicate by telephone with counsel, relatives or friends, and

(iv) that he will not be questioned unless he wishes, and that if he wishes to consult a lawyer or have a lawyer present during questioning, he will not be questioned at this time, and that after being taken to the stationhouse a lawyer will be furnished him prior to questioning if he is unable to obtain one.]

(b) *Limitations on Questioning.* No law enforcement officer shall question a person detained pursuant to the authority in this Section who he suspects or has reasonable cause to suspect may have committed a crime, if such person has indicated in any manner that he does not wish to be questioned, or that he wishes to consult counsel before submitting to any questioning.

Additionally, the initial stop of Berry by Markonni constituted a seizure, which triggers fourth amendment protections. Unlike the majority, I find the instant situation to be demonstrably close to that in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse*, a Delaware state police officer randomly pulled a vehicle over to the side of the road. This involved a show of authority (perhaps a siren and flashing lights) and may have caused substantial anxiety. It also involved an interference with the individual's movement. The Supreme Court suppressed evidence obtained from the stop, as the stop was not based upon reasonable suspicion.

In the instant case, all of these factors are present. Thus, I do not accept the proposition advanced by the majority that the show of authority, the anxiety caused, the interference with the individual's movement, and the time lost during stop is somehow less in an airport stop than in *Prouse*.[7] In the present case, since reasonable suspicion did not exist, Berry was "randomly" stopped. Markonni identified himself and showed his badge, thus there was a show of authority. Indeed, the instant cause presents a much greater potential to arouse fear in an individual than the *Prouse* situation. If being pulled over by a policeman to the side of the road "may create substantial anxiety,"[8] I daresay that being stopped at an airport by a Drug Enforcement Administration agent creates greater anxiety. Further, the loss of time involved in an airport stop may well be more onerous upon an individual than time lost during a *Prouse*-type stop. Since I believe that *Prouse*

should control the instant case, I would suppress the evidence that resulted from the seizure because it was not supported by reasonable suspicion.

Lastly, I disagree with the majority's holding that the taint of the illegal arrest[9] was sufficiently attenuated to allow the drugs discovered in the search to be admitted against Berry and Zabish. It justifies its position on the basis that Berry and Zabish consented to the search. As the majority opinion correctly points out, in order to eliminate any taint from an involuntary seizure or arrest, there must be proof both that the consent was voluntary and that it was not the product of an illegal detention. Neither prong of this test is met satisfactorily in the instant case.

The consent was the result of the illegal detention. I find recent Supreme Court cases to be controlling. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), dealt with similar issues.[10] Although consent was given by Berry and Zabish after Markonni had advised them of their right to refuse, this is not dispositive. *Dunaway* indicates that the temporal proximity of an illegal arrest and a confession, the presence of intervening circumstances, and the purpose and flagrancy of police misconduct are factors that should be taken into account by the courts to determine whether the consent was tainted by the illegal detention. Applying these factors to the instant case, I cannot accept the majority's result. Berry and Zabish consented to be searched a few

---

I believe the above guidelines represent a proper balance between the rights of individuals and the needs of law enforcement.

7. Further, as I have indicated above, I do not believe that a reasonable man would feel free to leave when approached by a Drug Enforcement Administration agent at an airport.

8. 440 U.S. at 657, 99 S.Ct. at 1398.

9. Since the majority did not reach the issue of whether the violation of the Georgia statute gave Markonni probable cause to arrest the pair, I will also treat the consent issue without reference to that possibility.

10. *Dunaway* is particularly applicable to the case at bar. There, the Rochester police picked up an individual even though they lacked enough evidence to obtain an arrest warrant. He was not told that he was under arrest, but would have been physically restrained if he had attempted to flee. He was taken to the police station and given *Miranda* warnings. Eventually, he made incriminating statements which implicated him in a murder. The Supreme Court suppressed the evidence flowing from the illegal detention.

minutes after their illegal detention commenced.[11] The only intervening circumstances were Markonni's warning that they were free to refuse consent and to contact an attorney and the fact that they were allowed to consult with one another (in Markonni's presence) for a few seconds. It should be noted in this regard that in *Dunaway*, the giving of *Miranda* warnings and his consent to the interrogation failed to attenuate the taint of an illegal arrest. Further, the arrest of Berry and Zabish without probable cause and Markonni's pattern of disregard towards the rights of detainees constituted police misconduct.[12] Thus, I believe that the majority has wrongly held that the consent was not the product of an illegal arrest.

Further, the consent was not voluntarily given. A substantial factor in the tendering of the consent was the implicit threat of prosecution for the Georgia misdemeanor if consent was not forthcoming. Indeed, the appellants dispute that they *ever* gave their consent. Under these circumstances, I doubt that the consent was voluntary.

Since I believe that the consent was involuntarily given and the result of an illegal arrest, I would suppress the drugs found during the searches of Berry and Zabish as fruits of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

I believe that the majority has erroneously dealt with the fifth and fourth amendment issues involved in the instant case. Therefore, I dissent.

---

**11.** Contrast this with the situation in *Brown* where the Supreme Court indicated that "less than two hours" might not be enough time to attenuate the taint (422 U.S. at 603–04, 95 S.Ct. at 2261–62), and that in *Dunaway* where a statement made "within an hour" of Dunaway's arrival at the station did not attenuate the taint (442 U.S. at 203, 99 S.Ct. at 2251).

