UNITED STATES of America

v.

Jant PRICE.

Crim. No. 4–87–187–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

March 4, 1988.

Marvin Collins, U.S. Atty., J. Michael Worley, Asst. U.S. Atty., Fort Worth, Tex., for plaintiff.

V. Wayne Ward, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

*Will you walk into my parlour?*
*said the spider to the fly.*
*(You may find you have consented,*
*without ever knowing why.)* [1]

The Fort Worth Division of the United States District Court for the Northern District of Texas has been faced with a disproportionate number of cases involving drug couriers transporting narcotics between major source and distribution centers throughout the United States. Time and time again, this Court has been required to categorize the interaction between Drug Enforcement Administration ("DEA") agents and citizens at the Dallas–Fort Worth International Airport ("DFW"). Once more, the Court is called upon to do so. The Defendant in this criminal action, Jant Price, has moved to suppress evidence obtained during an airport stop.

Within the context of the fourth amendment, three separate spheres of police-citizen contact co-exist: (1) mere communication which involves no element of detention or coercion; (2) brief investigatory stops which must be supported by an officer's reasonable suspicion; and (3) full scale arrests which so restrain a person's liberty as to require the showing of probable cause.[2] These categories, like the tones in a spectrum, tend to blur at the edges.[3] Outside the vacuum of pure theory—when, for example, a court is confronted with conflicting testimony, vague recollections, and little conclusive evidence—the labels are advisory rather than definitional.[4] Not surprisingly, they become difficult to articulate, and even more difficult to apply.[5]

---

1. *United States v. Mendenhall,* 446 U.S. 544, 577 n. 15, 100 S.Ct. 1870, 1889 n. 15, 64 L.Ed.2d 497 (1980) (White, J., dissenting).

2. *See, e.g., United States v. Hanson,* 801 F.2d 757, 761 (5th Cir.1986)

3. "[A]irport cases tend to be very fact specific— reasonable suspicion may exist on one set of facts, but not on another." *United States v. Hanson,* 801 F.2d 757, 762 (5th Cir.1986). *See also United States v. Berry,* 670 F.2d 583, 596 (5th Cir.1982).

4. The Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 18 n. 15, 88 S.Ct. 1868, 1878 n. 15, 20 L.Ed.2d 889 (1967), avoided an overly technical distinction between "stop and frisk" and "searches and seizures." Chief Justice Warren wrote: "In our

view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness." *Id.* at 17–18 n. 15, 88 S.Ct. at 1877–78 n. 15.

5. [T]he factfinding required with regard to airport stops must involve distinguishing nuances of tone and language—whether a phrase was worded as an order or a question, whether a question was so peremptory as to be a command in all but punctuation—that are subject to easy distortion or poor recall by parties and that hence might allow covert coercion easily to escape a casual review by a court.

The flourishing drug transportation business at DFW requires the Court to again utilize this three-tiered analysis. Hence, four issues must be addressed.[6] They are: (1) whether and when a seizure occurred; (2) if a seizure occurred, whether reasonable suspicion existed at the time of the seizure; (3) whether the Defendant voluntarily consented to the search and/or seizure; and, (4) if the Defendant voluntarily consented but the seizure, if any, was illegal, whether the search was the infected product of an illegal seizure.[7]

The Court is not unmindful of the difficulty in detecting drug trafficking. Drugs may easily be hidden in a passenger's luggage or concealed on their person. In fact, the obstacles in detecting this form of illegal conduct may be unparalleled in the area of law enforcement. And it is doubtlessly true that the "public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit."[8] Few crimes so drastically threaten the health and welfare of our nation than the escalating use of controlled substances. The Court recognizes, too, that drug trafficking is compelled by the force of well organized and sophisticated criminal syndicates. The financial incentives for this deplorable trade are tremendous. While DEA enforcement programs have made some progress in both diminishing the flow of narcotics and drug couriers, the prospect of diminishing law enforcement efforts in this area is nowhere in sight.

Despite the compelling interest in combatting the serious threat posed by narcotics distribution, the Court must reluctantly conclude that this vital, societal interest has to yield to an even more compelling one, namely, that of a citizen's constitutionally protected interest in privacy, when, as here, the Defendant's questionable acquiescence to the search of his person is the tainted product of an illegal detention. The Court cautiously invokes the exclusionary rule, knowing full well that "a rigid and unthinking application of the exclusionary rule, in futile protest against practices which it can never be used effectively to control, may exact a high toll in human injury and frustration of efforts to prevent crime."[9]

## I. FACTS AND PROCEEDINGS

While "[n]o judicial opinion can comprehend the protean variety of the street encounter,"[10] the Court has no alternative but to judge the facts which are put before it. The pivotal ones which form the basis of the Defendant's Motion to Suppress are heavily disputed. The arresting officers and the Defendant depict two, sometimes three, different versions of the events which led to the Defendant's arrest. The salient facts, where disputed, will be set forth separately below. A reconciliation is not possible. At various dispositive points, one version will have to be selected over the other. Since the question whether a seizure has occurred often requires "refined judgment, especially when no force, physical restraint, or blatant show of authority is involved,"[11] the Court relegates its findings on disputed factual issues to

*United States v. Berry,* 670 F.2d 583, 596 (5th Cir.1982).

**6.** As will be seen, these issues form the basis of the Court's analysis and the structure of its Opinion.

**7.** Judge Randall quite ably utilized this approach in *United States v. Robinson,* 625 F.2d 1211, 1214 (1980). The framing of the issues in this manner enhances analysis and assures clarity.

**8.** *United States v. Mendenhall,* 446 U.S. 544, 561 (1980) (Powell, J., concurring).

**9.** *Terry v. Ohio,* 392 U.S. 1, 15, 88 S.Ct. 1868, 1876, 20 L.Ed.2d 889 (1967) (Warren, C.J.).

**10.** *Id.* at 15, 88 S.Ct. at 1876.

**11.** *United States v. Elmore,* 595 F.2d 1036, 1041–42 (5th Cir.1979) (footnote omitted).

the Analysis Section, or Part II, of this Opinion.

A full chronology of the relevant events begins on November 13, 1987, at the Los Angeles International Airport ("LAX"). There, Clay Searle, a Los Angeles Police Officer assigned to the DEA Task Force, observed two black males approach the ticket counter. Both appeared nervous and looked about the terminal area. One carried a red suitcase, purchased a ticket, and gave it and the suitcase to the other, the Defendant. The Defendant then boarded Flight 90, departing for DFW.

Searle approached the black male who had not boarded the aircraft and questioned him. The man denied purchasing a ticket. Searle went to the ticket counter, made an inquiry, and learned that a one-way, cash ticket from LAX to DFW, continuing on Flight 300 to Jackson, Mississippi, had been purchased. The ticket bore the name "Ned Price."

Searle phoned Randall Johnson, an Irving Police Officer assigned to the DEA Task Force at DFW, and recounted what he had learned and observed. Searle advised Johnson that the Defendant would be arriving on Flight 90. He described the Defendant as a black male, approximately six feet tall, wearing a blue jogging suit and carrying a red suitcase. In regard to the suitcase Searle's observation is somewhat flawed. There is no question that it was red. However, Officer Johnson testified that Searle stated that the *Defendant was carrying* a suitcase. This was not the case. The suitcase had been checked-in at the ticket counter and transported in the baggage compartment of the aircraft.

At approximately 7:00 p.m., Officer Johnson, accompanied by DEA Agent Terri Stover, met Delta Flight 90 upon its arrival at DFW. They watched the passengers exit

the aircraft and observed the Defendant, a black male who fit the description given to them by Agent Searle. The Defendant was not carrying a suitcase. Immediately, Officer Johnson and Agent Stover boarded the aircraft and searched the passenger compartment. No luggage of any sort was found; all of the passengers had deplaned.

Johnson and Stover returned to the terminal and went to the lounge area of Gate 17. The Defendant's connecting flight to Jackson, Mississippi, was to depart from this Gate. The Officers saw the Defendant near the departure area using a pay telephone. Officer Johnson testified that the Defendant, while talking on the phone, "looked up and down the concourse area" and "it appeared that he was looking to see if he was being watched or followed." After the Defendant completed the call, Officers Johnson and Stover approached the Defendant in the concourse as he walked toward the lounge area of Gate 17. They identified themselves as law enforcement officers.[12]

Officer Johnson asked if he could speak with the Defendant "for just a minute." The Defendant agreed. Johnson asked to look at the Defendant's airplane ticket. The Defendant did not verbally object and handed Johnson the ticket and the folder in which it was contained. Attached to the folder was a baggage claim stub. Officer Johnson examined the ticket, verified that it was the one-way cash ticket Agent Searle in Los Angeles had described, and returned the ticket and the folder to the Defendant. Johnson asked the Defendant if he had any identification; the Defendant stated that he had none.

Officer Johnson explained to the Defendant that he "worked narcotics" at DFW and asked the Defendant if the officers could retrieve the Defendant's suitcase from the belly of the aircraft, bring it up

---

**12.** Approximately, twenty to twenty-five minutes had now passed since Flight 90 had landed.

the lounge area, and examine its contents. The Defendant agreed to the Officers' retrieval and search of the suitcase.

At this point, there are two versions of what occurred. Officer Johnson testified that he again asked to see the Defendants ticket folder to obtain the baggage claim number. While Johnson does not recall whether the Defendant handed him the ticket folder or merely opened it so he could see the number, Johnson testified that he somehow obtained the number and wrote it down on a piece of notepaper. Johnson insists that he either returned the ticket to the Defendant or that the Defendant, never having relinquished the ticket, put it in his jogging suit coat pocket. Agent Stover's testimony confirmed Johnson's version.

Naturally, the Defendant paints a different picture. He claims that he handed the ticket folder to Johnson who, in turn, gave it to Agent Stover. The Defendant testified that it was Agent Stover who wrote "something" down. He insists that she retained the ticket in order to retrieve the luggage. Unfortunately, the officers did not anticipate the need to bolster their testimony. The piece of notepaper upon which the Defendant's baggage claim number was allegedly inscribed was neither retained nor submitted into evidence.

In any event, Agent Stover, now armed with a ticket or a piece of notepaper, or both, went off to retrieve the Defendant's suitcase. Here again, different versions of what occurred emerge. Only this time instead of two versions, there are three.

Agent Stover claims that as she started down the jetway to retrieve the suitcase, she overheard the Defendant ask Officer Johnson if he could go to the restaurant. Stover testified that Johnson explained to the Defendant that they were in the process of retrieving his luggage and asked if he would mind waiting. Stover's testimony indicates that the Defendant did not affirmatively respond to Johnson's question but that he impliedly acquiesced by stating that he would "just go over here" to the lounge area and "sit down."

Officer Johnson had a different recollection of the Defendant's request to get something to eat. His testimony does not precisely fix the time in which the request was made, nor does he associate the Defendant's request with Agent Stover's movement down the jetway. Although Johnson's testimony is not particularly clear on this point, a fair reading indicates that, sometime during the period in which Agent Stover was absent, the Defendant asked if he could leave to get something to eat. Johnson maintains that he asked the Defendant if he would remain in the area until Agent Stover returned. To this request, contends Johnson, the Defendant responded affirmatively by stating "that he did not mind waiting."

The Defendant again sets a different stage. He testified that when Officer Johnson took his airplane ticket the Officer told him he could not leave. The Defendant stated that while he was sitting in the lounge area with Johnson waiting for Stover to return, he asked Johnson if he could leave to get something to eat. He testified that Johnson asked him if he would mind waiting. In this respect, the Defendant and Johnson are in agreement; beyond this, they part company. The Defendant says he nonverbally acquiesced to Johnson's request to remain in the area. The Defendant contends that he did not object, or simply leave, because in his words, "I thought I was under arrest."

The Officers had approached the Defendant in the concourse area of the airport terminal. After the Defendant decided, for whatever reason, to remain in the area until his luggage was retrieved and searched, he walked toward the lounge area of Gate 17 and took a seat. This was

the Gate from which the Defendant's connecting flight was to depart. He was followed by Officer Johnson. Johnson accompanied the Defendant and sat beside him. The Defendant was never out of Johnson's reach or visible presence. Together in the lounge area, the Defendant and Officer Johnson waited for Agent Stover to return with the suitcase.

Agent Stover's trip to obtain the Defendant's suitcase took approximately 5 to 10 minutes. She did not travel alone. At her request, she was accompanied by a "Redcoat," an airline employee who supervises ticket agents. The Redcoat opened the door to the jetway, and both Agent Stover and the Redcoat went down to the tarmac, the place where airplanes are taxied, to retrieve the suitcase. The transfer baggage for Flight 90 was contained on a cart off by itself near the aircraft. The Defendant's red suitcase, apparently an easily identifiable item, was immediately recognized by Agent Stover. She went to the cart and compared the Defendant's baggage claim number with that of the baggage tag on the red suitcase. The numbers having matched, she removed the red suitcase from the cart and returned to the lounge area of Gate 17 where Officer Johnson and the Defendant were waiting.

The Defendant identified the red suitcase as his own and again consented to Officer Johnson's request to search the suitcase. Johnson opened the suitcase, searched through its contents, but found no contraband. The suitcase contained only clothing and personal items.

At this point, Johnson turned his interest to the Defendant's person and his pockets.

Johnson testified that the Defendant appeared nervous when the officers initially approached him and throughout their encounter. In fact, Johnson testified that during the entire time period in which Agent Stover was gone the Defendant "was extremely nervous" and "continuously [kept] his hands inside his jogging suit in the top part of the pockets." Yet only when the search of the luggage proved unbeneficial, did he begin to focus his inquiry into what the Defendant's pocket contained.

Officer Johnson asked the Defendant whether he had any money or narcotics. The Defendant said he did not. The Defendant raised up his jogging suit coat and revealed his mid-section; no narcotics were visible. Officer Johnson "felt around" the Defendant's midsection to confirm what he did not see.[13] Compelled by the Defendant's nervousness [14]—a characteristic Officer Johnson believed was somehow unique to this Defendant, unlike other travelers he routinely stops, who apparently become calmer during prolonged questioning—Johnson persisted, and asked the Defendant whether he was carrying anything in the pockets of his jogging suit coat. The Defendant again answered "no."

Undaunted, Johnson persisted and asked the Defendant if he would object to emptying his pockets. The Defendant did not verbally respond but removed what was contained in his *right* pocket, some cigarettes and a few dollar bills. Officer Johnson then asked the Defendant if he, Officer Johnson, could search the Defendant's pockets. In his Affidavit supporting the criminal complaint, Johnson stated that at this point the Defendant "stood up and put both hands to his side." When testifying,

---

**13.** This somewhat unobtrusive "pat-down" was not disclosed until Officer Stover testified. Remarkably, she stated on cross-examination that she would not consider this a search.

**14.** On direct examination, Officer Johnson testified that the Defendant was "extremely" or "ab-

normally nervous" and "continued his nervous characteristics." On cross-examination, however, Officer Johnson could not convincingly substantiate these rather conclusory statements. When pressed, the only "nervous characteristics" that Officer Johnson could describe were

however, Johnson described the incident differently. He stated that the Defendant verbally consented to his search.

Agent's Stover's description of these final salient events basically supports Johnson's version, yet in regard to the Defendant's verbal consent to the search of his left pocket her testimony is conspicuously nonconfirmatory. Agent Stover's testimony substantiates only the information contained in Johnson's Affidavit, namely, that the Defendant "stood up and put his hands to side."

Johnson's search of the Defendant's left pocket did uncover a plastic bag enclosing 42 small plastic packages which contained a white powder.[15] A field test was performed on one of the small plastic packages. Cocaine was present. The Defendant was read the *Miranda* warnings, handcuffed, and placed under arrest.

The Defendant's version of what occurred after Officer Johnson searched his luggage is markedly different than that of the officers. The Defendant testified that when Officer Johnson asked to search him, he refused, and stated that he did not want to be searched. The Defendant contends that even though he refused to consent to the search Officer Johnson was insistent and said the he "would like to see what was in [the Defendant's pockets]." The Defendant testified that he again refused but Johnson insisted that he empty his pockets. The Defendant emptied his right pocket; he contends Johnson asked him to stand up and turn around, which he did, and at that point the officer searched his

left pocket which contained the plastic packages.

The officers and the Defendant generally agree that about 15 to 20 minutes elapsed between the time the officers approached the Defendant and the time at which the Defendant was placed under arrest. This time period is consistent with the amount of time the Defendant had between connecting flights. The Defendant had a forty-five minute layover; Flight 90 landed at approximately 7:00 p.m., Flight 300 to Jackson, Mississippi, was to depart at 7:45. After Flight 90 landed, the officers waited approximately 20 to 25 minutes to approach him. If the Defendant's encounter with the officers lasted approximately 15 to 20 minutes, these time periods would coincide with the Defendant's testimony that at the time of his arrest Flight 300 was boarding for departure.

The officers never told the Defendant that he had the right to refuse both a search of his person and personal property. It is also undisputed that the officers never told the Defendant that he was free to leave, nor that he had the right to refuse to speak with them.

## II. ANALYSIS

### A. Whether and When a Seizure Occurred

When distinguishing a consensual encounter from a seizure, or whether a detention has exceeded the bounds of an investigatory stop, caselaw provides no definitive "litmus test."[16]

> Even in the discrete category of airport encounters, there will be endless varia-

---

an occasional inflection in the Defendant's voice and his "shuffling [of] feet." The Officer added that he "didn't know whether you'd call that nervous or not."

**15.** It should be noted here that at this point on both direct and cross-examination Officer Johnson had every opportunity to fully describe the effects contained in the Defendant's pockets. Surprisingly, the Defendant's airplane ticket, which the officers allegedly returned to him, is ostensibly missing. The only explanation Offi-

cer Johnson proffered in rebuttal was that the ticket had to be somewhere on the Defendant's person since it appeared among the Defendant's personal effects after his arrest. As will be seen, the Court later finds in favor of the Officers' credibility on this point. Yet, the Court is troubled by this striking omission in the Officer's testimony.

**16.** *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983).

tions in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment.[17]

■ The threshold requirement is one of reasonableness; the standard broad both in scope and definition: whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." [18] The Government bears the burden of demonstrating "that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." [19]

Before the Court begins its Fourth Amendment analysis under the standards stated above, it notes that no dispute exists over whether there was probable cause to arrest the Defendant once cocaine was discovered in his pocket. The dispute, however, lies in the events that led to this discovery. More particularly, whether Officer Johnson's discovery was the result of a non-consensual detention unsupported by reasonable suspicion "that the individual [was] involved in criminal activity." [20]

The disputed facts in this case suggest that at various times in the Defendant's encounter with the Officers a seizure could have occurred which would trigger Fourth Amendment analysis. Depending on which version of the salient facts the Court finds most credible, the Defendant could have been "seized" at one of three possible points. The Court examines each in turn, making dispositive fact findings as required.

■ First, initial encounters between police and citizens have been considered "seizures" within the purview of the Fourth Amendment.[21] The Court finds in this case that no seizure occurred when the Officers' initially approached the Defendant. The evidence clearly established that Officer Johnson asked to speak with the Defendant. The Defendant's testimony substantiates this finding; he testified that he agreed to speak with the officers. No evidence was presented, nor was it even suggested, that the Defendant's consent to *initially* speak with the officers was coerced or involuntary in any respect. Not every contact between citizens and police in the course of an investigation is subject to Fourth Amendment scrutiny.[22]

Second, a seizure requiring Fourth Amendment analysis could have occurred when Officer Johnson identified himself as

**17.** *Royer,* 460 U.S. at 506–07, 103 S.Ct. at 1329.

**18.** *United States v. Mendendall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980); *United States v. Berry,* 670 F.2d 583, 595 (5th Cir.1982) (unit B) (en banc). *See also United States v. Robinson,* 625 F.2d 1211, 1216 (5th Cir.1980); *United States v. Elmore,* 595 F.2d 1036, 1041–42 (1979).

**19.** *United States v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

**20.** *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

**21.** *Compare Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam) (DEA agents approach and request that Defendant display airline ticket not supported by reasonable suspicion) *with United States v. Berry,* 670 F.2d 583, 603 (5th Cir.1982) (initial approach of agents who identified themselves and asked to speak to the Defendant not a seizure). *See also United States v. Robinson,* 625 F.2d 1211, 1219 (5th Cir.1980) (case remanded for a determination whether initial encounter constituted an illegal seizure).

**22.** *See United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980); *Terry v. Ohio,* 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (White, J., concurring) ("nothing in the Constitution ... prevents a policeman from addressing questions to anyone on the streets").

a narcotics officer and asked the Defendant if the officers could retrieve and search his luggage. The Court concludes that a seizure did occur at this point. The Fifth Circuit Court of Appeals' decision in *United States v. Hanson*[23] supports this conclusion.

The *Hanson* decision emanated from this Court. In *Hanson*, this Court concluded that at *no* point in the contact between the defendant and the officers did a seizure occur prior to the defendant's arrest. Although this Court was affirmed in *Hanson*, the Court of Appeals did not agree that at no point in the defendant's encounter with the officers did a seizure occur. The *Hanson* Court concluded that when the defendant was asked to step aside, his driver's license retained, and informed that he and a co-defendant were suspected of carrying narcotics that "a reasonable person would not have believed that he was free to go."[24] The Court of Appeals reached this conclusion despite the fact that the defendant had offered to consent to the search of his briefcase.[25]

The Court finds the reasoning set forth in *Hanson* controlling here. The Government in its brief appears to concede, too, that at this point a seizure occurred.[26] When Johnson asked to search the Defendant's checked luggage, he had already asked to examine both Johnson's airplane ticket and personal identification. Johnson had earlier identified himself as a police officer and, at this point in the encounter, stated specifically that he worked "narcotics."

The case before the Court is dissimilar to *Hanson* in only two respects. In *Hanson*, the officer who detained the defendant informed him that he and the co-defendant were suspected of carrying drugs. In light of Johnson's disclosure that he was a narcotics officer and wished to search the Defendant's luggage, the Court concludes that it is not beyond peradventure that the Defendant believed he was the focus of a narcotics investigation, despite the absence of an express statement by the officers to that effect.

The other distinguishing factor is that in *Hanson* the defendant's drivers license was retained by the police. In this case, the Defendant had no identification. While Johnson asked to see the Defendant's airplane ticket, both Officers Johnson and Stover testified that the ticket was returned to the Defendant. The Officers also testified that the ticket was returned when it was requested a second time to obtain the Defendant's baggage claim number. While the Defendant's testimony contradicts that of the Officers, the Court considers them more credible on this point.[27] Thus the Court finds that the Officers did not retain the Defendant's airplane ticket in order to retrieve his luggage.

Another factor in this case strongly suggests that a reasonable person in a situation similar to that of the Defendant would not have believed he was free to leave when the Officers requested to search his luggage. The Defendant was never told he could decline to speak with Officers or refuse to consent to their requests. While the Constitution does not require that the suspect of a criminal investigation be informed of this right, such knowledge "is highly relevant" to the determination that

---

23. 801 F.2d 757 (5th Cir.1986).

24. *Hanson*, 801 F.2d at 761.

25. *Hanson*, 801 F.2d at 761.

26. Government's Answer to Defendant's Motion to Suppress Evidence at p. 5 ("At least until the officer asked for permission to examine the defendant's checked luggage, no seizure occurred.") (citing *Hanson*, 801 F.2d at 761).

27. Clearly, the retention of the Defendant's airplane ticket would have constituted a seizure within the context of Fourth Amendment analysis. *See, e.g., United States v. Morin*, 665 F.2d 765, 769 (5th Cir.1982) (confiscation of defendant's airplane ticket in addition to other factors effectively placed him under arrest); *United States v. Elmore*, 595 F.2d 1036, 1042 (5th Cir. 1979) ("we conclude that the District Court could have reasonably concluded (as it did) that no seizure occurred until Agent Markonni carried Elmore's ticket away....").

any consent given was proffered voluntarily.[28] Despite the fact the Defendant agreed to the search of his luggage, the Court pinpoints Officer Johnson's request to retrieve and search the Defendant's suitcase as the time in which a seizure of the Defendant occurred. As the Court of Appeals has consistently noted, "statements which intimate that an investigation has focused on a specific individual *easily* could induce a reasonable person to believe that failure to cooperate would only lead to formal detention."[29]

Other factors in this case bear this conclusion out. The Defendant did not appear well-educated or articulate when testifying. A review of the case file indicates that he did not complete high school. The Court may properly consider this factor when determining whether the Defendant was capable of "knowing consent."[30] The Court notes, too, that the Defendant stated several times when testifying that believed he was under arrest. While the Defendant's subjective feelings are hardly dispositive on the issue, they are clearly "relevant as part of the totality of circumstances"[31] and may properly be considered.

Moreover, after the Defendant agreed to the search of his suitcase and Agent Stover had gone to retrieve it, he asked Officer Johnson if he could leave the area to get something to eat. Such a request would hardly emanate from a person who believed he was free to leave.

There is conflicting testimony whether the Defendant was told to remain in the area (Defendant's testimony), merely acquiesced to Johnson's request (Stover's testimony), or expressly agreed to wait until Agent Stover returned (Johnson's testimony). The Court found Agent Stover's depiction of events most plausible in this regard and, therefore, finds that the Defendant merely acquiesced to Johnson's request to remain.[32] Given the coercive nature of the request, the Defendant's acquiescence does not attenuate the Court's finding that the Defendant had been "seized" within the purview of the Fourth Amendment. Similar to the Defendant's consent to the retrieval and search of his suitcase, the Court finds that his questionable willingness to remain until Agent Stover returned was again the product of a reasonable belief that "failure to cooperate would only lead to formal detention."[33]

In sum, the Court concludes that a seizure occurred when Officer Johnson asked the Defendant to allow the Officers to retrieve and search his luggage. When viewing the "totality of circumstances" present in this airport stop, several factors substantiate this conclusion.

First, immediately prior to Johnson's request, the Officer identified himself as a narcotics officer. Second, Johnson had previously identified himself as a police officer and asked to examine the Defendant's airplane ticket. Third, Johnson requested permission to retrieve the Defendant's luggage from the belly of the aircraft and search it. Fourth, while the Defendant was waiting for Agent Stover to return with his suitcase, he asked permission to leave to get something to eat; he was in essence detained in the lounge area while awaiting a connecting flight. Fifth, in light of the Defendant's limited education and subjective belief he was under arrest, considered in conjunction with the Officers' failure to inform him that he was free to

---

**28.** *United States v. Mendenhall*, 446 U.S. 544, 559, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (plurality); *United States v. Robinson*, 625 F.2d 1211, 1218 (5th Cir.1980) ("highly relevant in the voluntariness determination").

**29.** *United States v. Berry*, 670 F.2d 583, 597 (5th Cir.1982) (Unit B) (en banc) (emphasis added); *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir.1986) (quoting *United States v. Berry* ).

**30.** *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). *See also Schneckloth v. Bustamonte*, 412 U.S.

218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

**31.** *United States v. Robinson*, 625 F.2d 1211, 1219 (5th Cir.1980).

**32.** Agent Stover testified that the Defendant stated that he would "just go over here" and "sit down" when Officer Johnson asked him if was willing to remain in the area.

**33.** *Hanson*, 801 F.2d at 761 (quoting *Berry*, 670 F.2d at 597).

decline to consent to a search, the Defendant's acquiescence did not diminish the coercive nature of their requests. "In such a situation it would be easy to misinterpret acquiescence to an officer's demands as consent...."[34] As will be seen, "acquiescence cannot, of course, substitute for free consent."[35]

The Court stated earlier in its discussion that events which led to the Defendant's arrest presented three possible points in which he could have been considered "seized." Thus far, the Court has discussed only two of these points. While it is generally true that once reasonable suspicion is found any subsequent seizure is justified, the Court finds that the Defendant was also "seized" during the time *after* the search of his luggage produced no narcotics. Although subsequent seizures are usually justified in view of the suspicion supporting the initial one, police officers are not free to ignore facts which tend to dispel their suspicions. The Court makes this finding as to the subsequent seizure now for purposes that will be apparent later in this Opinion.

## B. Whether Reasonable Suspicion Existed

Having found that a seizure occurred at the point in time when Officer Johnson requested to retrieve and search the Defendant's suitcase, the Court must now turn to the issue of whether the seizure was supported by a reasonable suspicion criminal activity was afoot. This determination requires an evaluation of the articulable facts known to Officers at the time of the seizure. "Facts which become known to the police officer after the seizure cannot be used to justify it."[36] And the Court would add, nor can police officers disregard facts which tend to dispel reasonable suspicion in a self-serving attempt to continue an investigatory stop beyond the scope of

the momentary detention contemplated by the *Terry* decision and its progeny.[37]

The Court finds that in this case the seizure of the Defendant was supported by a reasonable suspicion that he was engaged in criminal activities. The Officers' suspicion, however, is not overwhelming, and while it will sustain a brief detention, no facts are present which will support any transgression overstepping the permissible limits of an investigatory stop.

At the time the Defendant was seized, Agent Searle had informed Officer Johnson that he had observed the Defendant and another suspect at the Los Angeles International Airport. Agent Searle told Johnson that the suspects exhibited suspicious behavior. They purchased a one-way cash ticket. They appeared nervous and watchful. The suspect Searle spoke with denied purchasing a ticket. Agent Searle's attention focused on a red suitcase. It was transferred by the one suspect who remained in Los Angeles to the Defendant. Although Searle was mistaken in his belief that the Defendant carried the suitcase onboard the aircraft—in fact he had left it at the ticket counter for transport by the carrier—his suspicions appear to have been especially aroused. So much so, that Officer Johnson and Agent Stover focused their investigation on the contents of the suitcase.

Officer Johnson knew that the Defendant was arriving from a source city for narcotics, and Johnson waited, along with Agent Stover, for the Defendant to deplane at the Dallas–Fort Worth International Airport. Unfortunately, their observation of the Defendant prior to the time they approached him adds little to a finding of reasonable suspicion. Upon the Defendant's exit from the aircraft, the officers searched the plane's passenger compart-

---

**34.** *Berry,* 670 F.2d at 596.

**35.** *Berry,* 670 F.2d at 596 (citing *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968)).

**36.** *United States v. Robinson,* 625 F.2d 1211, 1217 (5th Cir.1980).

**37.** *See, e.g., United States v. Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

ment for the red suitcase. Their search uncovered nothing.

The officers returned to the gate area of the Defendant's connecting flight, and they observed him talking on a public telephone. Despite their conclusory statements that the Defendant appeared nervous, the officers were unable to articulate any specific traits which the Defendant displayed to support their conclusion. This inability is strikingly different from that of the officers in *Hanson*. In *Hanson*, a co-defendant's nervous characteristics were an important factor in the Court's determination that reasonable suspicion existed to detain two suspected drug traffickers. There, the officers testified that the co-defendant "chain-smoked and paced about while waiting for the luggage, picking up a phone several times without making a call." [38] No similar mannerisms are attributed to this Defendant.

Additionally, the officers in *Hanson* were "experienced in the area of narcotics enforcement." Yet, in this case, both Officer Johnson or Agent Stover had less than two years experience in the highly specialized area of intercepting and arresting drug couriers. Officer Johnson, while he had heard of the "drug courier profile," had never been informed of its specific characteristics. He had no formal training in combatting drug trafficking through the use of proven and lawful procedure. He testified that he utilized "his own" method of identifying persons he suspected of carrying narcotics. His training, he said, was obtained through "hands-on" experience.

Moreover, the defendants in *Hanson* travelled under an assumed name. There, the officers discovered this fact prior to the time a seizure occurred. Here, while the Defendant's ticket was in the name of "Ned" Price, as opposed to "Jant Price," the officers were unaware, throughout their entire encounter with the Defendant, that the name on his ticket was different than his own. The Defendant carried no personal identification and was unable to satisfy the Officers' request that he produce some.

While these factors tend to diminish a reasonable suspicion that the Defendant was engaged in criminal activity, they do not obliterate it. And while the case is clearly distinguishable from *Hanson*, the Court is not precluded from finding that at the time the Officers requested to search the Defendant's luggage reasonable suspicion existed to support this detention.

The Officers' reasonable suspicion that the Defendant was engaged in criminal activity is in part based on the following articulable facts: (1) the Defendant and the suspect who accompanied him in Los Angeles appeared nervous and watchful as observed by Agent Searle in Los Angeles; (2) they purchased a one-way ticket; (3) the ticket was purchased with cash; and (4) the Defendant was arriving from a source city for drugs. These are perhaps four of eleven characteristics of the drug courier profile.[39] Admittedly, these characteristics "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as [this] could justify a seizure." [40] Thus,

---

**38.** *Hanson,* 801 F.2d at 763.

**39.** The precise characteristics of the profile tend to vary:

> The seven primary characteristics are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itinerary, such as rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination curren-

> cy; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.
> The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities.
> *Berry,* 670 F.2d at 599.

**40.** *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). In *Reid,* the fact that the defendants walked in a suspicious manner and matched other profile characteris-

it is well settled in this Circuit that a match between profile characteristics and characteristics exhibited by a defendant will "not, in and of itself, create a reasonable suspicion sufficient to justify an investigatory stop."[41]

The Officers in this case, however, had more. They knew that (1) the suspect accompanying the Defendant in Los Angeles had denied purchasing an airline ticket and (2) Agent Searle had observed the transfer of the suitcase from the suspect to the Defendant. These factors in addition to the characteristics exhibited by the Defendant which matched the drug courier profile create a case comparable to *Hanson.* There, reasonable suspicion was found under similar, although somewhat distinguishable, circumstances.[42] The Court emphasizes that the Officers' suspicions, while reasonable, were weak and focused primarily upon the Defendant's red suitcase. Their articulable suspicions would support no more than a brief investigatory stop.

Given the Court's finding that a seizure occurred when Officer Johnson requested to search the Defendant's luggage, the Defendant's entire encounter with the Officers had now lasted approximately 15 minutes by the time Agent Stover returned from the jetway with the suitcase. The search of the suitcase revealed nothing but mens clothing. The fabric of the Officers' suspicion had begun to unravel, yet Officer Johnson persisted in detaining the Defendant.

The fact that no narcotics were found in the suitcase should have weighed heavily in the Officers' determination whether it was proper to detain the Defendant further or discontinue their investigation. Since the Defendant's suitcase had been the primary focus of the Officers' investigation prior to this point, they were not free to ignore it. The Fifth Circuit Court of Appeals has readily upheld this principle in the framework of probable cause,[43] and this Court sees no reason why it should not be applied here, especially since the investigatory stop in issue rested upon rather tenuous suspicions.[44] When Officer Johnson decided to continue to detain the Defendant, he exceeded the permissible limits of the brief investigatory stop which, prior to this time, the officers' articulable suspicions had been barely able to sustain.

Now, Officer Johnson turned his suspicions upon the Defendant's person. He began to inquire about what was in the Defendant's pockets. This is somewhat strange given the fact that Johnson had sat with the Defendant for almost 10 minutes while Agent Stover retrieved the suitcase. Yet, during this entire time, he made no inquiries about what the Defendant's pockets contained. He chose, instead, to make small-talk, discussing football, basketball, and California weather with the Defendant. If it were only after the search of the suitcase that Officer Johnson noticed that

---

tics, such as arriving from a source city, attempting to conceal that the fact that they were traveling together, arriving on an early morning flight, and carrying no luggage, did not support a finding of reasonable suspicion which warranted an investigatory stop. *Id.* at 441–42, 100 S.Ct. at 2754–55.

**41.** *Hanson,* 801 F.2d at 762 (citing *Berry,* 670 F.2d at 600).

**42.** In *Hanson,* the circumstances which aroused the officers' suspicions were that the defendants: (1) paid cash for their tickets; (2) purchased one-way tickets; (3) travelled to Miami, a source city; (4) travelled under assumed names; and, (5) appeared nervous and watchful. *Hanson,* 801 F.2d at 761. *See also United States v. Berry,* 670 F.2d 583, 603 (5th Cir.1982) (Unit B) (en banc).

In *Berry,* the defendant: (1) arrived from a source city; (2) appeared nervous; (3) travelled

under an assumed name; (4) attempted to leave the airport by means of public transportation; and (5) tried to conceal the fact that he was traveling with a companion. Under these circumstances, reasonable suspicion was found to exist to warrant an investigatory stop.

**43.** *Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir.1988).

**44.** *Cf. Florida v. Royer,* 460 U.S. 491, 502–03, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983) ("What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure ... where the police, unsatisfied with previous explanations [which should have dispelled their original suspicions] sought to confirm their suspicions." *Id.* at 503, 103 S.Ct. at 1327.

the Defendant was suspiciously keeping his hands in his pockets, then his observation simply came too late. The record is unclear on the point. But the trait is typical of many "presumably innocent travelers." [45]

After the suitcase was searched, nothing came to the Officer's attention to bolster their suspicions. Yet, they continued to detain the Defendant. They did not tell him that he was free to leave or free to decline to speak with them. One Officer stood in front of the Defendant, the other to his side. Officer Johnson asked the Defendant if he was carrying narcotics. Although the Defendant told him that he was not, Johnson "patted-down" the Defendant's mid-section when he displayed it to the Officers. By this point their investigatory stop was supported only by the type of inarticulable suspicion and hunch condemned in other cases. [46]

The Defendant's connecting flight was beginning to board; still, the Officers persisted in their investigation. Johnson asked the Defendant if he would empty his pockets. The Defendant removed what was contained in his right pocket; there were no narcotics. Officer Johnson then asked if he could search the Defendant. The evidence clearly shows that at this point the Defendant "stood up and put both hands to his side." Officer Johnson then searched the Defendant's left pocket and found narcotics.

## C.  Voluntary Consent

■  The Defendant's acquiescence to the search of his person did not attenuate the taint of his unlawful detention. Under the circumstances of this case, the Court has been continuously unwilling to interpret the Defendant's mere acquiescence as free, knowing, and voluntary consent to the actions of the Officers. As the *Hanson* Court emphasized, a reasonable person in the Defendant's position could easily have concluded that "failure to cooperate would only lead to formal detention." By the time when the Defendant arguably acquiesced to the search of his person, the Officers' actions were tantamount to a formal arrest—an arrest unsupported by probable cause and exigent circumstance. [47] The Supreme Court of the United States has made it clear that the police may not "seek to verify their suspicions by means that approach the conditions of an arrest." [48] This is precisely what the Officers attempted to do here.

## D.  Fruit of the Poisonous Tree

The Defendant's questionable submission to the search of his person and the narcotics discovered there are both infected products of what had become an illegal stop. Originally, reasonable suspicion had existed to briefly detain the Defendant to search his luggage. This suspicion dissipated when the search failed to uncover narcotics. The Officers could not ignore evidence which tended to dispel their primary suspicion that narcotics were contained in the Defendant's red suitcase. By detaining the Defendant beyond this point, they surpassed the permissible limits of an investigatory stop. [49] The Defendant's sub-

---

**45.**  *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754.

**46.**  *See United States v. Glass,* 741 F.2d 83, 85 (5th Cir.1984). In *Glass,* reasonable suspicion to detain the defendant could not be supported by the fact that he: (1) arrived from a source city; (2) recognized another individual upon deplaning; (3) travelled under an assumed name; and, (4) had become known to the arresting officer through a "tip" received by DEA agent in another city. *See also Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed. 2d 890 (1980) (discussed *supra* n. 40).

**47.**  "The line between a valid investigatory stop and an arrest requiring probable cause is a fine one." *Hanson,* 801 F.2d at 763.

**48.**  *Florida v. Royer,* 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

**49.**  The Court has not touched on the issue of whether there was a more expeditious way to investigate the contents of the Defendant's luggage. "The courts," however, "are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage." *Florida v. Royer,* 460 U.S. 491, 505, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983). In *Royer,* the Supreme Court wrote:

There is no indication here that this means [use of narcotics detection dogs] was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure

missive acquiescence to Johnson's requests did not remove the taint of the Officers' misconduct.[50]  Rather, the Defendant's acquiescence, if any, was a direct product of a Fourth Amendment violation.  The fact that Officer Johnson's unarticulable suspicions proved correct did not justify this intrusion upon the Defendant's right to privacy.

### ORDER

Accordingly, the Defendant's Motion to Suppress evidence obtained during an illegal seizure at DFW is GRANTED.  The Defendant must be discharged.

was carried out.  Indeed, it may be that no detention would have been necessary.  A negative result would have freed Royer in short order; a positive result would have resulted in his justifiable arrest on probable cause.
*Royer*, 460 U.S. at 506, 103 S.Ct. at 1329.

**50.**  *See United States v. Robinson,* 625 F.2d 1211 (1980) ("[A] voluntary consent to search does not remove the taint of an illegal seizure.  Rather, voluntariness is merely a threshold requirement.  The causal connection between the illegal seizure and the consent to search must be independently examined....")